ACCEPTED
05-14-01392-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
3/24/2015 12:00:10 AM
LISA MATZ
CLERK

5th Court of Appeals
FILED: 03-31-15
Lisa Matz, Clerk

**Appeal No. 05-14-01392-CV**

———————————————

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
3/24/2015 12:00:10 AM
LISA MATZ
Clerk

**In the Court of Appeals**

**Fifth Judicial District**

**Dallas, Texas**

———————————————

**K.W. Ministries, Inc. v. Auction Credit Enterprises, LLC**

———————————————

## <u>APPELLANT'S BRIEF</u>

*ORAL ARGUMENT REQUESTED*

Yolonda Sewell
Attorney for Appellant
State Bar No. 24044111
6731 Bridge Street, Suite 379
Fort Worth, Texas 76112
Telephone: (806)239-2130
Facsimile: (817)531-9977
E-mail: yolonda_sewell@yahoo.com

John E. Leslie
State Bar No. 12231400
JOHN LESLIE | PLLC
1805 West Park Row Drive, Suite C
Arlington, Texas 76013
Telephone: (817) 505-1291
Facsimile: (817) 505-1292
Email: arlingtonlaw@aol.com

*Identity of Parties and Counsel*

The following is a list of all parties and all counsel in this matter:

Appellant in this matter is K.W. Ministries, Inc. f/d/b/a C.R.U.S.H. Auto Sales, and

is Plaintiff in the underlying case described below.  The attorneys representing Appellant

are:

Yolonda Sewell
6731 Bridge Street, Suite 379
Fort Worth, Texas 76112
Tel: (806) 239-2130
Fax: (817) 531-9977

John Leslie
John Leslie PLLC
1805 W. Park Row Drive, Suite C
Arlington, Texas 76013
Tel: (817) 505-1291
Fax: (817) 505-1292

Appellee in this matter is Auction Credit Enterprises, LLC, and is Defendant in the

underlying case described below. The attorneys representing Appellee are:

Robert Wise
Lillard Wise & Szygenda, PLLC
5949 Sherry Lane, Suite 1255
Dallas, Texas 75225
Tel:  (214) 739-2005
Fax:  (214) 739-2010

### *Table of Contents*

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..2

Table of Contents …………………………………………………………3, 4

Index of Authorities …………………………………………………………5

Statement of the Case …………………………………………………………..6

Issues Presented ……………………………………………………….......6

     I.     <u>The trial court erred when it failed to consider K.W. Ministries, Inc.'s amended response.</u> …………………………………………...17, 18, 19

     II.     <u>The trial court erred in granting Auction Credit Enterprises, LLC's no-evidence motion for summary judgment when there is some evidence to support K.W. Ministries, Inc.'s claims.</u>……………………………….19, 20

     III.     <u>The trial court erred in granting Auction Credit Enterprises, LLC's traditional motion for summary judgment when there is a genuine issue of material fact.</u> …………………………………………………...20

Statement of Facts …………………………………7, 8, 9, 10, 11, 12, 13, 14, 15, 16

Summary of Argument …………………………………………………16, 17

Argument …………………………………………………………………...17

     I.     Standard of Review …………………………………………………17, 18

     II.     Amended Summary Judgment Response Disallowed ……………18, 19, 20

     III.     Some Evidence to Defeat No-Evidence Motion ……………………… 20, 21

     IV.     Genuine Issue Material Fact to Defeat Traditional Motion ……………21, 22

Prayer …………………………………………………………………22

**Appendix** …………………………………………………………………………….23, 24, 25

    I.      Copy of Final Summary Judgment …………………………………………23

    II.    Text of Texas Rule of Civil Procedure 166a ……………………..23, 24, 25

    III.   Text of Texas Civil Practice & Remedies Code §16.068 …………………25

    IV.   Contract Between The Parties ………………………………………………..25

*Index of Authorities*

Rules

Texas Rule of Civil Procedure 166a ………………..………………………………...17, 18

Statutes

Texas Civil Practice & Remedies Code §16.068 ……………………………………….19

Cases

*Austin v. Inet Technologies, Inc.*, 118 S.W.3d 491, 495 (Tex. App.—Dallas 2003).

…………………………………………………………………………………16, 17, 21

*Havlen v. McDougall*, 22 S.W.3d 343, 345 (Tex. 2000).…………………………………16

*Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 ((Tex.1985).…....16, 17

*Wayment v. Texas Kentworth Company*, 248 S.W.3d 883, 885 (Tex. App.—Dallas 2008) (*citing* Tex.R.Civ.P. 166a(i) and *Western Inv., v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005))………………………………………………………………....…17, 19

*Statement of the Case*

1.      The underlying suit arises out of Cause No. DC-13-14570, styled "K.W. Ministries, Inc. d/b/a C.R.U.S.H. Auto Sales v. Auction Credit Enterprises, LLC," in the 116th Judicial District Court, Dallas County, Texas.[1]

2.      The underlying suit is an action for breach of contract, fraud, defamation, deceptive trade practices, and damages arising from a motor vehicle floorplan financing agreement.[2]

3.      Appellee, Auction Credit Enterprises, LLC, filed a traditional and no-evidence motion for summary judgment.[3] Appellant filed an original and amended response.[4] The district court did not consider the amended response.[5]

4.      The district court granted Appellee's motion for summary judgment.[6] This appeal ensued.[7]

*Issues Presented*

I.      The trial court erred when it failed to consider K.W. Ministries, Inc.'s amended summary judgment response.

    a.  Texas Rule of Civil Procedure 166a applies

    b.  The Relation-Back Doctrine applies

II.     The trial court erred in granting Auction Credit Enterprises, LLC's no-

---

[1] C. R. at 5-65.
[2] *Id*.
[3] *Id*. at 69-406
[4] *Id*. at 407-424 and 483-522.
[5] R.R. at 29-36.
[6] C.R. at 600-01.
[7] *Id*. at 602-04.

evidence motion for summary judgment when there is some evidence to support K.W. Ministries, Inc.'s claims.

III. The trial court erred in granting Auction Credit Enterprises, LLC's traditional motion for summary judgment when there is a genuine issue of material fact.

*Statement of Facts*

In the summer of 2011, Plaintiff was engaged in the business of selling used vehicles to retail customers from a lot on Lancaster Street in Fort Worth, Texas under the assumed name "C.R.U.S.H. Auto Sales".[8]  Defendant was in the business of providing inventory financing to used car dealers, commonly referred to as "floorplan financing".[9]  In late July or early August 2011, Joe Madrid ("Madrid"), Defendant's Regional Manager, made a "cold call" on Plaintiff at its business premises to see if Plaintiff was interested in obtaining floor plan financing for its used car inventory.[10] Defendant, after one or more follow-up calls and meetings with Plaintiff, offered to extend "floor plan" financing to Plaintiff through its representative, Madrid.  Plaintiff accepted Defendant's offer.[11]

In furtherance of the "floor plan" lending arrangement, on August 11, 2011 Plaintiff, by and through Kenneth Williams ("Williams"), its President, signed a "Demand Promissory Note and Security Agreement" (the "Contract") at Defendant's office under the direction of Defendant's representative "Agnes."[12]  Although

---

[8] C.R. at 6.
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*

Williams' signature was notarized within the Contract, Madrid, the Notary Public who purportedly acknowledged Williams' signature to the Contract, was not present when Williams signed the Contract and Williams never saw Madrid affix his notary signature or stamp to the Contract.[13] Neither Williams nor Plaintiff was given a copy of the Contract at the time it was signed, or at any time thereafter.[14] After making demand on Defendant for a copy of the Contract, Plaintiff finally received a copy of the Contract on November 17, 2011, following Defendant's termination of its floorplan relationship with Plaintiff.[15]

At the time the Contract was entered into by Plaintiff, Plaintiff had no previous experience with floorplan financing arrangements, a fact communicated by Williams to Madrid.[16] Defendant, being fully aware of Plaintiff's lack of knowledge of the details of floorplan financing and Plaintiff's inferior bargaining position, told Plaintiff that its physical possession of titles to vehicles Plaintiff owned outright, free and clear of liens, of an aggregate value of $75,000.00, together with a lien and security interest on all of Plaintiffs then-existing and after-acquired property, was necessary to initially secure the floorplan arrangement.[17] In accordance with its demand, at the time the Contract was signed, Defendant took physical possession of titles to the following vehicles: a 2010 Cadillac SRX Luxury (VIN #3GYFNAEYIAS516971); a 2010 Toyota Camry LE (VIN#4Tl BF3EK5AUI00605); a 2008 Chrysler 300 (VIN

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*

#2C3LA53G08H303839); and a 2007 Cadillac CTS (VIN # IG6DP577670122419), promising to return the titles to Plaintiff on November 1, 2011 (collectively, the "Pledged Vehicles").[18]

During August, September and October, 2011, Plaintiff purchased a number of vehicles with the floorplan financing provided by Defendant and paid for these vehicles on a timely basis, without default, according to the terms of the Contract.[19] At the outset of their relationship, and at all times thereafter, Defendant instructed Plaintiff to make payment checks payable to "AAA" and not to Auction Credit Enterprises, LLC. Not knowing the reason or justification for this request, Plaintiff nonetheless complied with Defendant's instructions.

From time to time, Defendant requested post-dated checks from Plaintiff to pay for vehicles financed through Defendant which were contracted for sale, but not yet funded by the purchasers or their banks.[20] Defendant was instructed by Plaintiff to hold these checks until the sales were closed and the purchase price was received by Plaintiff.[21] Nonetheless, on two occasions Defendant deposited Plaintiff's payment check earlier than agreed upon, resulting in the checks being returned "NSF" by Plaintiff's bank.[22] In at least one instance, Defendant charged Plaintiff a $200.00 fee per returned check, even though Plaintiff's recollection was that the Contract provided

---

[18] *Id*. at 6-7.
[19] *Id*. at 7.
[20] *Id*.
[21] *Id*.
[22] *Id*.

for only a $50.00 returned check fee.[23] Plaintiff believed Defendant's demand for the higher NSF fee was in violation of the Contract's terms. However, Plaintiff paid the higher fee without question or complaint in order to preserve its then-cordial business relationship with Defendant.[24]

As November 1, 2011 approached, Plaintiff began to make inquiries of Defendant about the promised return of the titles to the Pledged Vehicles.[25] Defendant refused to return these titles to Plaintiff, even though Plaintiff was not in payment default under the Contract.[26] In order to assure Defendant of its fully (and actually, over) secured position under the Contract, Plaintiff attempted to pay for several vehicles in its inventory in advance of the payment date required under the Contract.[27] Defendant refused to accept Plaintiff's payment for these vehicles, accelerated all amounts due under the Contract, and demanded payment of the entire amount advanced to Plaintiff under the Contract, even though payments on specific vehicles were not yet due.[28] There was no outstanding uncured event of default under the Contract when this demand was made. On November 16, 2011, at approximately 3:45 p.m., Defendant, by and through its employees Madrid and Jesse Hidalgo, came to Plaintiff's car lot under the auspices of an "inventory check".[29] At that time, Defendant demanded possession of, and removed the following vehicles from Plaintiff's business

---

[23] *Id*. (*referencing* Contract §2.3(l)).
[24] *Id*. at 7.
[25] *Id*.
[26] *Id*.
[27] *Id*.
[28] *Id*.
[29] *Id*.

premises: a 2008 Chrysler 300 (VIN#2C3LA53G08H303839, one of the aforementioned "Pledged Vehicles"); a 2007 Kia Spectra (VIN #KNAFE121675453928); and a 2006 Nissan Maxima (VIN #IN4BA4IEX6C853039).[30]

On November 17, 2011, Defendant finally provided Plaintiff with a copy of the Contract. Over three (3) months had passed from the time the Contract was signed until Defendant finally gave Plaintiff a copy of the Contract.

On November 18, 2011, Defendant took possession of an additional vehicle owned by Plaintiff: a 2010 Cadillac SRX Luxury (VIN# 3GYFNAEYIAS516971, being the second of the "Pledged Vehicles").[31] This vehicle was seized at the Manheim Dallas - Fort Worth auction facility where it had been placed by Plaintiff for sale. On that same day, Defendant came to Plaintiff's business premises and attempted to take possession of a 2010 Toyota Camry LE (VIN #4TlBF3EK5AUI00605, the last remaining "Pledged Vehicle").[32] Defendant used a different vehicle to block the sole entry to Plaintiff's car lot, thereby preventing Plaintiff's customers and employees from entering or exiting Plaintiff's business premises while Defendant unsuccessfully attempted to seize the aforementioned Toyota Camry.[33] One of Plaintiff's salesmen suffered bodily injury as a result of Defendant's actions.[34]

On November 21, 2011, Defendant took possession of a 2006 Kia Sorento from

---

[30] *Id*. at 7-8.
[31] *Id*. at 8.
[32] *Id*.
[33] *Id*.
[34] *Id*.

a third-party repair facility and a 2004 Nissan Maxima from Plaintiff's business premises while the vehicle was being repaired.[35] At the time of repossession, Defendant's representatives were told that the 2004 Nissan Maxima was owned by, and titled to, a customer of Plaintiff who was paying for the vehicle under a retail installment contract. This fact was of no consequence to Defendant, who defiantly repossessed the vehicle. As a result of Defendant's actions, Plaintiff was forced to provide its customer with a replacement vehicle. Defendant did not return the Maxima for over three (3) months, finally surrendering the vehicle to Plaintiff in March 2012. By the time the Maxima had been returned to Plaintiff, Plaintiff had lost the opportunity to sell the loaned vehicle before the model year change, thereby being damaged by its loss of value.

After the wrongful repossessions of vehicles on November 21, 2011, Plaintiff that same day sent Defendant a letter detailing its position with respect to the actions taken by Defendant and requested that Defendant refrain from further interruption of Plaintiff's business.[36] On the following day, Plaintiff spoke with Defendant regarding its intent to pay Defendant all amounts properly due under the Contract. In response, Defendant requested that Plaintiff submit a written payment plan to Defendant by Friday, November 25, 2011.[37]

Prior to expiration of the November 25, 2011 deadline, the following described

---

[35] *Id.*
[36] *Id.*
[37] *Id.* at 8-9.

exchanges of correspondence occurred[38]:

On November 23, 2011, Plaintiff received a letter from Defendant notifying Plaintiff of its private disposition of collateral in satisfaction of Plaintiff's obligations to Defendant.

On November 23, 2011, Plaintiff responded to Defendant's notice of private disposition of collateral, seeking clarification of certain items prior to submitting its payment plan to Defendant.

On November 25, 2011, Plaintiff submitted its payment plan to Defendant.

On November 28, 2011, Defendant replied by demanding payment in full of all vehicles sold "out of trust" by December 2. 2011.

Between December 6-8, 2011, Plaintiff paid Defendant $36,670.00 in certified funds, representing over sixty percent (60%) of the total balance alleged to be due Defendant. On December 22, 2011, Plaintiff remitted another certified funds payment to Defendant in the amount of $8,300.00, bringing total payments to $44,970.00, approximately 80% of the total amount claimed as due by Defendant.[39]

On December 6, 2011, Plaintiff remitted certified funds to Defendant in payment for a 2005 Ford F-150, a 2004 Nissan Maxima, and a 2007 Kia Spectra.[40] At that time, Plaintiff also intended to remit payment for a 2007 Pontiac G5; however, since Defendant had not received title to the vehicle, Plaintiff's payment for the vehicle

---

[38] *Id*. at 9.
[39] *Id*.
[40]*Id*.

was not accepted by Defendant.[41] Accordingly, Plaintiff tendered payment for a 2007 Hyundai Elantra for which title had been received, using the check originally designated for the 2007 Pontiac G5.[42] The 2007 Hyundai Elantra had been recently sold to a customer of Plaintiff, and was in the customer's possession.[43] Defendant refused this tender of payment, stating that the cashier's check showed "2007 Pontiac G5." Plaintiff suggested striking through 2007 Pontiac G5, inserting 2007 Hyundai Elantra, and initialing the change in its capacity as remitter of the check.[44] Defendant continued to refuse tender of this check.

Plaintiff indicated that it would return the next day with a new, replacement check for the 2007 Hyundai Elantra.[45] *However, that same night, before Plaintiff could bring a replacement check to Defendant, Defendant repossessed the 2007 Hyundai Elantra from Plaintiff's customer's residence.[46]* The following day, Plaintiff tendered payment for the 2007 Hyundai Elantra, as originally promised, and paid the repossession fee to Defendant, even though repossession was unwarranted and wrongful, resulting in damages to Plaintiff, both for the repossession fee and in its business reputation with its customer.[47]

The following additional wrongful acts by Defendant occurred on the same day as the acts complained of in the immediately preceding paragraph. All of the acts of

---

[41] *Id*. at 9-10.
[42] *Id*. at 10.
[43] *Id*.
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] *Id.*

Defendant on December 6, 2011 eventually led to the closure of Plaintiff's used car business. On December 6, 2011, Plaintiff discovered that Defendant had placed unnecessary and unjustified liens on the following vehicles: a 2007 Suzuki XL7; a 2007 Kia Spectra; a 2005 Ford F-150, and a 2004 Nissan Maxima. At the time these liens were placed on the vehicle titles, Defendant had actual physical possession of the titles and/or possession of the vehicles on which the liens were placed; therefore, recording liens on the titles was unnecessary. Thereafter, after these titles and the titled vehicles were returned to Plaintiff, Defendant knowingly executed invalid releases of lien on the same vehicles, as Madrid, Defendant's Branch Manager negligently and carelessly failed to write and sign his legal name on the titles in the manner required by the Texas Department of Motor Vehicles, thereby invalidating the releases and further damaging Plaintiff and its business reputation.[48]

On December 22, 2011 while making payment on a 2006 Nissan Maxima, Plaintiff was informed that Defendant charged additional repossession fees on the following vehicles: a 2004 Nissan Maxima; a 2006 Kia Sorento; a 2004 GMC Savana; a 2001 Nissan Altima; a 1997 Mitsubishi Montero Sport; a 2005 Ford F-150; and a 2007 Hyundai Elantra, increasing the remaining balance allegedly due Defendant under the Contract to $17,998.88.[49] Defendant confirmed this balance due by handing the written statement of its Chief Operating Officer, Tedd Martin to Plaintiff in a meeting on December 22, 2011. However, despite its reasonable and repeated

---

[48] *Id.*
[49] *Id.*

requests, Defendant never provided Plaintiff with a full accounting of the debt alleged to be due.[50] Defendant, in its pleadings, denies that it was obligated to provide Plaintiff with any accounting of the funds allegedly due Defendant.[51]

Defendant sold the 1997 Mitsubishi Montero Sport, 2001 Nissan Altima, 2004 GMC Savana, 2006 Kia Sorento, 2008 Chrysler 300, and 2010 Cadillac SRX which it had previously repossessed to satisfy the debt. [52]

On April 10, 2012, Plaintiff made demand on Defendant for damages under the Texas Deceptive Trade Practices Act, set forth in Tex. Bus. And Comm. Code section 17.41 et seq. ("DTPA").[53]

Defendant finally paid Plaintiff its over-collection on proceeds of collateral in early May, 2012, almost six (6) months after it terminated its loan relationship with Plaintiff, four and one half (4½) months from the date of its last meeting with Plaintiff and over three and one half (3 ½) months after its last sale of any vehicles.


*Summary of Argument*

The trial court erred when it failed to consider K.W. Ministries, Inc.'s amended summary judgment response. The amended summary judgment response was timely pursuant to Texas Rule of Civil Procedure 166a and the relation back doctrine as articulated in Texas Civil Practice and Remedies Code §16.068. The amended response contains

---

[50] *Id*. at 10-11.
[51] C. R. at 69 *et seq.*
[52] C.R. at 11.
[53] *Id*.

evidence sufficient to defeat the no-evidence and traditional motions for summary judgment.

### *Argument*

## *I.      Standard of Review*

A defendant moving for a traditional summary judgment must either (1) conclusively disprove at least one element of the plaintiff's theory of recovery; or (2) plead and conclusively establish each element of an affirmative defense.[54] When a defendant moves for summary judgment on an affirmative defense, it is the defendant's burden to conclusively establish the defense.[55] Once the movant establishes the right to summary judgment, the burden shifts to the non-movant to present the trial court with evidence of any issues that would preclude summary judgment.[56] A motion for summary judgment on traditional grounds is subject to de novo review.[57] In reviewing a motion for summary judgment, the appellate court must determine if any genuine issue of material fact exists to defeat the motion.[58] Evidence favoring the non-movant is taken as true and all reasonable inferences must be resolved in favor of the non-moving party.[59]

In a no-evidence summary judgment motion, the movant asserts there is no evidence of one or more elements upon which an adverse party has the burden of proof at

---

[54] *Austin v. Inet Technologies, Inc.*, 118 S.W.3d 491, 495 (Tex. App.–Dallas 2003).

[55] *Havlen v. McDougall*, 22 S.W.3d 343, 345 (Tex. 2000).
[56] *Austin*, 118 S.W.3d at 495.
[57] *Nixon v. Mr. Property Management Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985).
[58] *Id.*
[59] *Id.*

trial.[60] To defeat a no-evidence summary judgment motion, the non-moving party must point out evidence that raises a fact issue on the challenged elements.[61] Like a motion for traditional summary judgment, the standard of review for a no-evidence summary judgment is de novo. The reviewing court must construe the record in the light most favorable to the non-movant while disregarding all contrary evidence and inferences. [62]

## II.      *Amended Summary Judgment Response Disallowed*

### The trial court erred when it failed to consider K.W. Ministries, Inc.'s amended response.

The trial court erred when it failed to consider K.W. Ministries, Inc.'s amended response in deciding Auction Credit LLC's amended traditional and no-evidence motion for summary judgment. Auction Credit LLC filed its amended traditional and no-evidence motion for summary judgment on August 25, 2014.[63] Pursuant to Texas Rule of Civil Procedure 166a, K.W. Ministries, Inc.'s response was due on or before September 8, 2015.[64] K.W. Ministries, Inc. filed a response to the motion on said date.[65] Additionally, K.W. Ministries, Inc. filed an amended response the morning of, but prior to the summary judgment hearing.[66] The trial court declined to consider the amended response and the factual and legal evidence contained within the response.[67]

Texas Rule of Civil Procedure 166a(c) states

---

[60] *Wayment v. Texas Kentworth Company*, 248 S.W.3d 883, 885 (Tex. App.—Dallas 2008) (*citing* Tex.R.Civ.P. 166a(i) and *Western Inv., v. Urena*, 162 S.W.3d 547, 550 (Tex. 2005)).

[61] *Austin*, 118 S.W.3d at 495.

[62] *Id*.

[63] *See generally* C.R. at 69-127.

[64] Tex. R. Civ. Pro. 166a(c) (2014).

[65] C.R. at 407-24.

[66] *See generally* C.R. at 483-522.

[67] R.R. at 29-30, 36-37.

The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, *on file at the time of the hearing,* or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response.[68]

In the instant case, the amended response was on file at the time of the hearing, but the trial court failed to consider the amended response.[69] The amended response was sufficient to raise a genuine issue of material fact to defeat the traditional motion for summary judgment.[70] Likewise, the amended response proffered more than a scintilla of probative evidence as necessary to defeat the no-evidence motion for summary judgment.[71] Consequently, the court erred in failing to consider the amended response prior to rendering a decision on Auction Credit LLC's motion and in granting the summary judgment.

The trial court also erred in failing to consider the amended summary judgment response when the relation back doctrine applies. The trial court indicated that the deadline to file a response was September 8, 2015. As such, the trial court found that K.W. Ministries, Inc.'s amended response was untimely.[72] However, the relation back doctrine applies. The relation-back doctrine states that an amendment of a timely-filed pleading is timely unless the amendment is "wholly based on a new, distinct, or different

---

[68] Tex. R. Civ. Pro. 166a(c) (2014) (emphasis added).
[69] R.R. at 29-30, 36-37.
[70] *See generally* C.R. at 483-522.
[71] *Id.*
[72] R.R. at 36-37.

transaction or occurrence."[73] In this case, the amended response was based on the same case, the same parties, the same contract, the same facts, and the same circumstances. Therefore, the amended response should be deemed the same transaction or occurrence and found to be timely in accordance with the relation-back doctrine. The trial court erred in deeming the amended response untimely and failing to consider the contents of the same.

### III.     Some Evidence to Defeat No-Evidence Motion

**The trial court erred in granting Auction Credit Enterprises, LLC's no-evidence motion for summary judgment when there is some evidence to support K.W. Ministries, Inc.'s claims.**

The trial court erred in granting Auction Credit Enterprises, LLC's no-evidence motion for summary judgment because there exists some evidence to support K.W. Ministries, Inc.'s claims. In order to prevail on a no-evidence summary judgment motion, the movant must show that there is no evidence of one or more elements upon which an adverse party has the burden of proof at trial.[74] On the contrary, to defeat a no-evidence summary judgment motion, the non-moving party must point out evidence that raises a fact issue on the challenged elements.

Auction Credit Enterprises, LLC did not meet its burden. For example, on the breach of contract claim, K.W. Ministries, Inc. offered evidence to show that Auction Credit Enterprises, LLC breached the agreement by charging excessive insufficient fund

---

[73] Tex. Civ. Prac & Rem. Code §16.068 (2014).
[74] *Wayment*, 248 S.W.3d at 885.

fees,[75] by requiring certified funds,[76] by declining curtailments or extensions,[77] by repossessing vehicles under retail installment contract,[78] by charging for multiple lot checks,[79] by selling collateral for less than commercially reasonable values,[80] by failing to proceed against the bond,[81] by failing to timely return excess proceeds,[82] and by failing to provide an accounting.[83] Similarly, K.W. Ministries, Inc. provided evidence that Auction Credit Enterprises, LLC was not entitled to a qualified privilege on the defamation claim.[84] Further, K.W. Ministries, Inc. introduced evidence of Auction Credit Enterprises, LLC's unconscionable actions as it relates to the Texas Deceptive Trade Practices Act claim.[85] The facts and law outlined in the amended response amount to more than a scintilla of probative evidence necessary to defeat the no-evidence motion for summary judgment.[86] Therefore, the trial court erred by granting the motion for summary judgment.

### IV. *Genuine Issue of Material Fact to Defeat Traditional Motion*

**The trial court erred in granting Auction Credit Enterprises, LLC's traditional motion for summary judgment when there is a genuine issue of material fact.**

The trial court erred in granting the amended traditional motion for summary

---

[75] R.R. at 509-10.
[76] *Id*. at 510-11.
[77] *Id*. at 511-12.
[78] *Id*. at 512-15.
[79] *Id*. at 515.
[80] *Id*. at 515-16.
[81] *Id*. at 516-17.
[82] *Id*. at 517.
[83] *Id*. at 518-19.
[84] *Id*. at 492-97.
[85] *Id*. at 506-07.
[86] *See generally id*. at 483-522.

judgment because there exists a genuine issue of material fact to defeat the motion. To be successful on a traditional motion for summary judgment, the moving party must prove there exists no genuine issue of material fact.[87] As stated in argument section three, the amended response brings to light both genuine issues of material fact as well as defeats the affirmative defense claimed by Auction Credit Enterprises, LLC.[88] Namely, Auction Credit Enterprises, LLC charged excessive insufficient fund fees, was not legally entitled to a claim of qualified privilege, and committed unconscionable actions as articulated in mandatory precedent.[89] The trial court erred by granting the motion in light of the evidence in the amended response.

*Prayer*

K.W. Ministries, Inc. prays that this Court find that the trial court erred by disallowing the amended response and granting the motion for summary judgment when more than a scintilla of probative evidence exists.

---

[87] *Austin*, 118 S.W.3d at 495.
[88] *See generally* R.R. at 483-522.
[89] *See* notes 22-32.

Respectfully submitted,

By: /s/Yolonda Sewell
Yolonda Sewell
Texas Bar No. 24044111
6731 Bridge Street, Suite 379
Fort Worth, Texas 76112
Tel. (806) 239-2130
Fax. (817) 531-9977
E-mail yolonda_sewell@yahoo.com
Attorney for Appellant
K.W. Ministries, Inc. dba CRUSH Auto Sales

## CERTIFICATE OF SERVICE

I certify that, on February 21, 2015, I served a copy of Appellant's Brief by electronic service on Robert K. Wise at bwise@lwsattorneys.com. I further certify that a copy of this corrected brief was served on Robert K. Wise, appellee's counsel, by electronic service at bwise@lwsattorneys.com on March 23, 2015.

/s/Yolonda Sewell

_____
Yolonda Sewell

*Appendix*

I.       Copy of Final Summary Judgment

II.      Text of Texas Rule of Civil Procedure 166a

III.     Text of Civil Practice and Remedies Code §16.068

IV.     Contract Between The Parties

## NO DC-13-14570

| | | |
|---|---|---|
| K.W. MINISTRIES, INC  f/d/b/a<br>C R U S.H. AUTO SALES, | §<br>§<br>§ | IN THE DISTRICT COURT |
| Plaintiff, | §<br>§ | |
| v. | §<br>§ | |
| AUCTION CREDIT ENTERPRISES,<br>LLC, | §<br>§<br>§ | DALLAS COUNTY, TEXAS |
| Defendant. | §<br>§ | 116th JUDICIAL DISTRICT |

### FINAL SUMMARY JUDGMENT

After considering the amended summary judgment motion of Defendant Auction Credit Enterprises, LLC, and the motions for continuance and to strike of Plaintiff K.W Ministries, Inc. f/d/b/a C.R.U.S.H. Auto Sales, the parties' timely-filed briefs and affidavits, the matters about which this Court can take judicial notice, the other timely filed summary-judgment evidence, and counsels' arguments at the September 15, 2014 hearing, the Court hereby **grants** Defendant's summary judgment motion in its entirety, **denies** Plaintiff's motions, and **denies** Plaintiff's oral request at the September 15, 2014 hearing for leave to file its amended summary judgment response.

The Court further hereby **renders** summary judgment for Defendant.

It is, therefore, **ordered** that Plaintiff take nothing by its suit and that Defendant recover court costs from Plaintiff.

This judgment is final and disposes of all claims and all parties and is appealable, and the Court orders execution to issue for this judgment

**Signed** on September _29_, 2014.

_____
Judge Presiding

Rule 166a. SUMMARY JUDGMENT.

**Texas Rules**

**TEXAS RULES OF CIVIL PROCEDURE**

**Part II. RULES OF PRACTICE IN DISTRICT AND COUNTY COURTS**

**§ 8. PRE-TRIAL PROCEDURE.**

*As amended through June 10, 2014*

**Rule 166a. SUMMARY JUDGMENT**

(a) **For Claimant.** A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the adverse party has appeared or answered, move with or without supporting affidavits for a summary judgment in his favor upon all or any part thereof. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to amount of damages.

(b) **For Defending Party.** A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in his favor as to all or any part thereof.

(c) **Motion and Proceedings Thereon.** The motion for summary judgment shall state the specific grounds therefor. Except on leave of court, with notice to opposing counsel, the motion and any supporting affidavits shall be filed and served at least twenty-one days before the time specified for hearing. Except on leave of court, the adverse party, not later than seven days prior to the day of hearing may file and serve opposing affidavits or other written response. No oral testimony shall be received at the hearing. The judgment sought shall be rendered forthwith if (i) the deposition transcripts, interrogatory answers, and other discovery responses referenced or set forth in the motion or response, and (ii) the pleadings, admissions, affidavits, stipulations of the parties, and authenticated or certified public records, if any, on file at the time of the hearing, or filed thereafter and before judgment with permission of the court, show that, except as to the amount of damages, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law on the issues expressly set out in the motion or in an answer or any other response. Issues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal. A summary judgment may be based on uncontroverted testimonial evidence of an interested witness, or of an expert witness as to subject matter concerning which the trier of fact must be guided solely by the opinion testimony of experts, if the evidence is clear, positive and direct, otherwise credible and free from contradictions and

inconsistencies, and could have been readily controverted.

(d) **Appendices, References and Other Use of Discovery Not Otherwise on File.** Discovery products not on file with the clerk may be used as summary judgment evidence if copies of the material, appendices containing the evidence, or a notice containing specific references to the discovery or specific references to other instruments, are filed and served on all parties together with a statement of intent to use the specified discovery as summary judgment proofs: (i) at least twenty-one days before the hearing if such proofs are to be used to support the summary judgment; or (ii) at least seven days before the hearing if such proofs are to be used to oppose the summary judgment.

(e) **Case Not Fully Adjudicated on Motion.** If summary judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the judge may at the hearing examine the pleadings and the evidence on file, interrogate counsel, ascertain what material fact issues exist and make an order specifying the facts that are established as a matter of law, and directing such further proceedings in the action as are just.

(f) **Form of Affidavits; Further Testimony.** Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. Defects in the form of affidavits or attachments will not be grounds for reversal unless specifically pointed out by objection by an opposing party with opportunity, but refusal, to amend.

(g) **When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(h) **Affidavits Made in Bad Faith.** Should it appear to the satisfaction of the court at any time that any of the affidavits presented pursuant to this rule are presented in bad faith or solely for the purpose of delay, the court shall forthwith order the party employing them to pay to the other party the amount of the reasonable expenses which the filing of the affidavits caused him to incur, including reasonable attorney's fees, and any offending party or attorney may be adjudged guilty of contempt.

(i) **No-Evidence Motion.** After adequate time for discovery, a party without presenting summary judgment evidence may move for summary judgment on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the

burden of proof at trial. The motion must state the elements as to which there is no evidence. The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact.

§ 16.068. Amended And Supplemental Pleadings.

**Texas Statutes**

**Civil Practice and Remedies Code**

**Title 2. Trial, Judgment, And Appeal**

**Subtitle B. Trial Matters**

**Chapter 16. Limitations**

**Subchapter D. Miscellaneous Provisions**

*Current through the 2013 Regular and Special Sessions*

**§ 16.068. Amended And Supplemental Pleadings**


If a filed pleading relates to a cause of action, cross action, counterclaim, or defense that is not subject to a plea of limitation when the pleading is filed, a subsequent amendment or supplement to the pleading that changes the facts or grounds of liability or defense is not subject to a plea of limitation unless the amendment or supplement is wholly based on a new, distinct, or different transaction or occurrence.

**Cite as Tex. Civ. Prac. and Rem. Code § 16.068**

**History.** Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985.

C.R.U.S.H. Auto Sales

EXHIBIT A

# DEMAND PROMISSORY NOTE AND SECURITY AGREEMENT

FOR VALUE RECEIVED, each of the undersigned dealers (referred to jointly and severally herein as the "DEALER" which term shall mean as applicable each of the undersigned individually and all of the undersigned collectively) on behalf of themselves individually and in their representative capacity hereby jointly and severally promise to pay to the order of AUCTION CREDIT ENTERPRISES, LLC ("LENDER"), on demand at Lender's principal office at 219 North Loop 12, Irving, Texas 75061 or such other place that Lender may designate in writing, all Obligations as set out in the Term Sheet (the "Credit Limit"), or such greater or lesser sum as may be advanced from time to time, together with interest, costs, and fees as provided in this Demand Promissory Note and Security Agreement (the "Agreement").

1. DEFINITIONS

1.1 Defined Terms. All capitalized terms used shall have the meaning ascribed to them in the definitions contained in Section 13 of this Agreement.

1.2 Terms Defined in the Texas Uniform Commercial Code. Terms defined in the Texas Uniform Commercial Code which are not otherwise defined in this Agreement are used as defined in the Texas Uniform Commercial Code, as amended.

2. LOAN

2.1 Loan. Subject to the terms and conditions of this Agreement, Lender may make Loans to Dealer in the maximum principal amount of the Credit Limit. The Loans are secured by this Agreement.

2.2 Interest Rate. Interest shall accrue on all Dealer Obligations as follows:

(a) All outstanding Obligations under this Agreement shall accrue interest (based upon a 360 day year) and shall be compounded daily.

(b) The Base Rate plus the Contract Rate shall be the rate of Interest, so long as Dealer has not breached any representation, warranty, covenant or credit term required under this Agreement, or committed an Event of Default.

(c) If Dealer breaches any representation, warranty, covenant or credit term, the rate of Interest shall be the Base Rate plus the Risk Rate.

(d) If an Event of Default occurs as defined in Section 10 of this Agreement, the applicable rate of Interest shall be the Base Rate plus the Default Rate.

(e) The Base Rate, Risk Rate or Default Rate may be amended or modified by Lender in Lender's sole discretion by posting such amended or modified Base Rate, Risk Rate or Default Rate on a published rate, fee and term schedule posted at URL URL www.auctioncredit.com or in each Lender branch location. Lender may only increase the Base Rate, Risk Rate or Default Rate by 50 basis points in any one 30-day period.

(f) In the event that no Term Sheet has been executed or the Term Sheet does not include rate information, the Base Rate shall be 6%, the Contract Rate shall be 5%, the Risk Rate shall be 6% and the Default Rate shall be 12%.

2.3 Credit Terms and Procedures. In order to secure full and prompt payment and performance of all Obligations and in consideration of and a condition to the making of any Advance to Dealer under this Agreement, the following terms and procedures shall apply.

(a) The decision to make an Advance to Dealer is the exclusive right of Lender, and Dealer understands and agrees that Lender may refuse to make an Advance at any time, with or without cause and without prior notice to Dealer or any guarantors. Dealer is not obligated to finance any Inventory through Lender. If Lender's Place of Business is California, the amount of the first Advance under this Agreement must be at least $5,000.

(b) All Dealer requests to Lender for an Advance for the purpose of acquiring Purchase Money Inventory with Lender funds, or financing previously-acquired Inventory with Lender funds must include a copy of the bill of sale for any Unit which is the subject of the request, indicating the actual purchase price and vendor, a completed Odometer Disclosure Statement, and the Unit's certificate of title showing that it has been duly assigned to Dealer. If Lender elects to make any such Advance, the Advance shall be deemed an additional Obligation under this Agreement from the date on which the Advance is made.

(c) Lender is not required, but may make, without notice to Dealer and without regard to the Dealer's Credit Limit, Advances on Dealer's behalf for any obligation to a third party at any time Dealer is in default under the terms of the Agreement. If Lender elects to make an Advance, the Advance shall be deemed an additional Obligation under the Agreement from the date on which the Advance is made.

(d) Dealer must be in complete compliance with this Agreement before an Advance request will be approved by Lender. Lender may also require additional information from Dealer in a sworn affidavit including, but not limited to, a statement that Dealer has not used any Advance for any other purpose than its originally requested and verified purpose.

(e) Dealer shall pay all Obligations to Lender at the offices of Lender, on demand and without notice, with respect to Lender-Financed Inventory on the earlier of: (a) twenty-four (24) hours from the time Dealer receives payment by or on behalf of the purchaser of an item of Lender-Financed Inventory, (b) forty-eight (48) hours after the disposition by sale or otherwise of an item of Lender-Financed Inventory, (c) the Maturity Date or (d) upon demand by Lender. Lender shall apply such payments to the Lender-Financed Inventory Obligation incurred from said item of Lender-Financed Inventory. Notwithstanding anything in this Agreement to the contrary, if, after the disposition by sale or otherwise and subsequent payment to Lender as delineated above, a Shortage exists between any payments received by Lender and the Lender-Financed Inventory Obligation with respect to an item of Lender-Financed Inventory, that Shortage shall be considered an Obligation owed by Dealer to Lender and secured with Collateral other than Lender-Financed Inventory. Dealer shall pay to Lender at the offices of Lender all other Obligations, on demand and without notice. The order and method of application of such payments of the Obligations shall be in the discretion of Lender. Payments received by Lender after 5:00 p.m. as measured by Dealer's Home Branch shall be applied the next business day.

(f) If Dealer is in compliance with all other provisions of this Agreement, Lender may, in its sole discretion, permit an Extension of the Maturity Date relative to an item of Lender-Financed Inventory, upon the payment of Shortage, Interest, Floorplan Fee(s) and a principal reduction of the outstanding Advance relating to such item of Lender-Financed Inventory pursuant to this Agreement and as established in the Agreement and Term Sheet.

(g) So long as Dealer is not in default of this Agreement, Dealer may sell Lender-Financed Inventory to bona fide purchasers in the ordinary and regular course of Dealer's business, but nothing in this Agreement shall be deemed to waive or release any interest Lender may have under any other agreement in any Proceeds or replacements of the Lender-Financed Inventory. Upon the sale of any item of Lender-Financed Inventory, Dealer shall hold the amount received from the disposition in trust for the benefit of Lender and Dealer shall pay to Lender, in accordance with this Agreement, an amount equal to the unpaid balance of the Obligations relating to the sold item of Lender-Financed Inventory.

(h) Dealer shall allow Lender's officers, employees, agents, attorneys, designees and representatives access to Dealer's books and

records at the Dealer's Location to conduct audits of Dealer's Lender-Financed Inventory. Dealer shall be responsible for and agrees to pay all of Lender's expenses in conducting audits.

(i) Upon request by Dealer to obtain, for a legitimate business purpose, the Title to a specific item of Lender-Financed Inventory held by Lender, Lender may consider the request and, in Lender's sole discretion, grant such request. In the event Lender grants a request, Dealer shall deliver to Lender a check or draft which is signed and dated on the date on which the Dealer takes physical custody of the Title in an amount equal to the Obligation relating to the specific item of Lender-Financed Inventory. The subject Title must be returned to Lender within the time period established by Lender or any outstanding Obligation relating to any such Advance for such specific items of Lender-Financed Inventory shall become immediately due and payable, and Lender may deposit or present such check or draft for payment in partial or whole satisfaction.

(j) To protect Lender's interest, Dealer authorizes Lender to obtain credit information from a credit bureau, and any financial institutions or trade creditors that Dealer has provided, as well as any other credit investigation that Lender in Lender's sole discretion deems necessary. Dealer also authorizes Lender to contact any third parties to disclose information, including information contained in the Lender application, for the purpose of, among other things, obtaining intercreditor agreements and perfection of Lender's security interest. Dealer authorizes Lender to review Dealer's account periodically, which may include obtaining additional credit reports.

(k) All payments made by Dealer to Lender via check or ACH, at the time of issuance, must be written against or drawn upon an account that contains immediately available funds sufficient to cover the dollar amount of the check or ACH.

(l) Dealer's account is subject to "NSF" fees in the amount stated in the Term Sheet or maximum amount permitted by law for each check or ACH issued by Dealer which is subsequently returned for insufficient funds, in addition to any charge or fee imposed by Dealer's and/or Lender's depository institution. In the event that no Term Sheet has been executed or an executed Term Sheet fails to disclose the NSF fee, the NSF fee shall be $50.00.

(m) Lender may process checks electronically, at first presentment and at any re-presentments, by transmitting the amount of the check, routing number, account number and check serial number to Dealer's financial institution. By submitting a check for payment, Dealer authorizes Lender to initiate an electronic debit from its bank account. When Lender processes Dealer's check electronically, Dealer's payment may be debited from its bank account as soon as the same day Lender receives Dealer's check and it will not receive that cancelled check with its bank account statement.

(n) Dealer's account is subject to a late fee charge in the amount stated in the Term Sheet or the maximum amount permitted by law for any item of Lender-Financed Inventory that Dealer fails to remit payment under this Agreement when due. Dealer acknowledges and agrees that the late fee charged by Lender is a reasonable estimate of Lender's probable losses due to the delay, inconvenience, and administrative expenses associated with a late payment. In the event that no Term Sheet is executed or the executed Term Sheet fails to disclose the late fee, the late fee shall be the greater of 5% of the late payment or $250.00.

(o) Lender shall be entitled to maintain and publish changes to its Term Sheet by posting the same at URL www.auctioncredit.com or in each Lender branch location. Any rates, fees and amendments to the Term Sheet published by Lender shall be incorporated in this Agreement by reference and made a part of this Agreement. Lender may amend the rates and fees from time to time at Lender's sole discretion and without additional notice to Dealer other than the publication of such amendments at URL www.auctioncredit.com or in each Lender branch location.

(p) Dealer waives demand, presentment for payment, notice of dishonor, protest and notice of protest, and expressly agrees that the Agreement and all payments coming due under it may be extended or modified without affecting Dealer's Obligations under this Agreement.

Dealer understands that this Agreement matures upon issuance, and that Lender may, at any time, and without notice to Dealer, with or without cause, demand that the Obligations due under this Agreement be immediately paid in full. The demand nature of this Agreement does not limit Lender's election of remedies upon a default by Dealer. At Lender's option, Lender may reference a term of default for the purpose of permitting Lender to receive interest at the Default Rate. It is agreed that Lender may demand partial payments under this Agreement, and said partial demand shall not change Lender's rights under this Agreement.

(q) Dealer shall use all Advances solely for business purposes and not for personal, family or household purposes including, without limitation, Dealer may not use Advances to purchase a vehicle to be used for Dealer's personal, family, or household purpose.

3. SECURITY INTEREST IN COLLATERAL.

3.1 Grant of Security Interest. As security for the payment and performance of the Obligations, Lender shall have, and the Dealer grants to Lender, a continuing security interest in all of Dealer's assets and properties, wherever located, including, without limitation, the following Collateral:

(a) All Accounts, Deposit Accounts, General Intangibles, Documents, Instruments, Investment Property, Chattel Paper and any other similar rights of the Dealer however created or evidenced, whether now existing or hereafter owned, acquired, created, used, or arising, specifically including, without limitation, claims, leases, agreements, license agreements, licensing fees, royalties, policies, credit insurance, guaranties, letters of credit, advices of credit, binders or certificates of insurance, deposits, documents of title, securities, security interests, licenses, goodwill, tax refunds, customer lists, franchises, franchise rights, drawings, designs, marketing rights, computer programs, artwork, databases and other business property rights, all applications to acquire rights, for which application may at any time be made by the Dealer, together with any and all books and records pertaining to those rights and any right, title or interest in any Inventory which gave rise to an Account, and all Intellectual Property throughout the world;

(b) All Inventory, whether now existing or acquired and wherever located, specifically including, without limitation, Purchase Money Inventory now owned or acquired, and all additions, accessions, accessories, replacements, and Proceeds, together with any and all books and records;

(c) All Equipment, vehicles, vehicle parts, Fixtures, Goods and all other tangible personal property of the Dealer of every kind or nature, whether now owned or acquired, wherever located, specifically including, without limitation, all machinery, trucks, boats, on and off the road vehicles, forklifts, tools, dies, jigs, presses, appliances, implements, improvements, accessories, attachments, parts, components, partitions, systems, carpeting, draperies and apparatus;

(d) All products and proceeds of each of the foregoing, specifically including, without limitation:

(i) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Dealer from time to time,

(ii) any and all payments of any form made or due and payable to the Dealer in connection with any requisition, confiscation, condemnation, seizure or forfeiture of all or any part of the foregoing by any Governmental Authority or any Person acting under color of Governmental Authority,

(iii) to the extent of the value of Collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or damage to, the Collateral,

(iv) any Stock Rights, and

(v) any and all other amounts paid or payable under or in connection with any of the foregoing, whether or not in lieu the foregoing.

(e) All renewals, extensions, replacements, modifications, additions, improvements, accretions, accessions, betterments, substitutions, replacements, annexations, tools, accessories, parts and the like now in, attached to or which may be placed in or added to any Collateral, whether or not of like kind; and

(f) All rights, remedies, claims and demands under or in connection with each of the foregoing.

## 4. REPRESENTATIONS, WARRANTIES, AND COVENANTS

To induce Lender to enter into the Agreement and to make each and every loan and other financial accommodation, the Dealer (meaning each of the undersigned individually and all of the undersigned collectively, jointly and severally) represents and warrants to Lender that, except as may otherwise be provided in the Agreement:

**4.1 Name of Dealer.** The exact legal name of the Dealer as it is organized and its state of organization are each correctly stated in the signature page of this Agreement. Dealer shall immediately notify Lender in writing of any change to Dealer's legal name, address, business type, ownership, management or control, and shall execute any document necessary at Lender's request to bring Dealer into compliance with this Agreement.

**4.2 Principals and Dealership Location.** The Dealer's principals, and dealership location are set forth correctly in the Floor Plan Application. Dealer maintains all of its records with respect to its Accounts at the Dealership Location. Dealer has not at any time within the past four (4) months maintained its Dealership Location or its records with respect to Accounts at any other location.

**4.3 Title to Collateral.** All Collateral is lawfully owned by the Dealer, free and clear of any prior security interest, pledge, sale, assignment, transfer or other encumbrance other than Permitted Encumbrances; the Dealer has the unencumbered right to pledge, sell, assign or transfer the Collateral subject to the Permitted Encumbrances and to subject the Collateral to the security interest in favor of Lender; except for Permitted Encumbrances, no financing statement covering all or any portion of the Collateral is on file in any public office other than in favor of Lender; and the security interest created by this Agreement constitutes a legal and valid, first priority security interest in the Collateral.

**4.4 Business Records.** Dealer shall keep at all times complete and accurate records of Dealer's business and financial condition as Lender may reasonably request. Dealer authorizes Lender to share the information and any other information relating to Dealer's transaction with Lender to any and all persons or parties as Lender deems necessary.

**4.5 Negative Covenants.** Without the prior written consent of Lender:

(a) Dealer shall not pay or declare any dividends or distributions, redeeming any capital stock, repaying subordinate debt or other loans to any principal or guarantor of Dealer, during any time an Obligation exists from Dealer to Lender.

(b) Dealer shall not sell, transfer, lease or otherwise dispose of the Collateral, or discounting, with or without recourse, any of its Accounts, except for sales from Inventory in the ordinary course of business.

(c) Dealer shall not create or suffer to exist any Lien upon any of the Collateral, whether now owned or hereafter acquired.

(d) Dealer shall not enter into any consolidation or merger with, or acquisition of, any Person or sell any substantial portion of its assets.

(e) Dealer shall not purchase, redeem, retire or otherwise acquire any of its outstanding equity interests.

(f) Dealer shall not assume, guarantee or otherwise become liable as a guarantor or surety for the obligations of any Person, except (i) the endorsements by Borrower of negotiable instruments for deposit or collection in the ordinary course of business, and (ii) those in favor of Lender.

(g) Dealer shall not engage in any transaction with any Person other than in the ordinary course of business.

(h) Dealer shall not change its fiscal year or any of its significant accounting policies, except to the extent necessary to comply with GAAP.

(i) Dealer shall not make any material change in the nature of its business as of the date of this Agreement.

(j) Dealer shall not permit any event to occur or condition to exist which has a Material Adverse Effect and shall not directly or indirectly enter into or permit to exist any transaction (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service) with any holder or holders of any of the equity interests of Borrower, or with any Affiliate of Borrower which is not its Subsidiary, on terms that are less favorable to Borrower or any of its Subsidiaries, as applicable, than those that might be obtained in an arm's length transaction at the time from Persons who are not such a holder or Affiliate.

(k) Dealer shall not amend, modify or otherwise change any of the terms or provisions in any of its articles of organization or operating agreement in effect on the date on the date of this Agreement without the prior written consent of Lender.

(l) Dealer shall not make any advances or loans to any Affiliates.

**4.6 Permits and Licenses.** Dealer warrants that it has obtained all necessary permits and licenses pursuant to local, state, and federal law required to operate its business as a wholesale or retail seller, lessor or renter of the Lender-Financed Inventory and has complied with all filing requirements to operate as the entity or business type on record with the appropriate governmental offices.

**4.7 No Pending Actions.** Dealer warrants that there are no legal, arbitration, administrative or other proceedings pending or threatened against Dealer which could reasonably affect the Collateral or which materially and adversely affect the properties, business, prospects, or condition, financial or otherwise, of the Dealer or Dealer's ability to honor its Obligations.

**4.8 Guarantees.** Dealer shall cause each owner of Dealer to execute a guaranty in a form provided by Lender in favor of Lender with respect to the Obligations. If Dealer is owned in whole or in part by a legally recognized business entity or trust, then Dealer shall cause the entity or trust to execute a guaranty in the name of the entity or trust in addition to any other required guarantees. All guarantees shall be incorporated by reference and made a part of this Agreement.

**4.9 Representations Regarding Accounts.** Except for Permitted Encumbrances, each Account:

(a) is a valid Account representing an undisputed, bona fide right to payment from the Account Debtor named for goods sold or leased, intellectual property licensed, or for services rendered, whether or not the right to payment has been earned by performance;

(b) is free and clear of any agreement in which the Account Debtor may claim a deduction or discount; and

(c) is free and clear of all set-offs or counterclaims.

**4.10 Representations Regarding Contracts and Leases.** All leases of real or personal property and all contracts to which the Dealer is a party are in full force and effect. To the best of Dealer's knowledge, no Person is challenging or disputing the validity or enforceability of any such leases or contracts, and the Dealer is not in material default under any such leases or contracts.

**4.11 Representations Regarding Equipment and Inventory.** Dealer has not purchased any Inventory in a transaction subject to the bulk transfer laws of any state or otherwise outside the ordinary course of the seller's business.

**4.12 Representations Regarding Consigned Goods.** Dealer does not engage in the sale of consigned goods. Dealer not a party to any consignment contracts. Dealer is not generally known by its creditors to be in the business of selling consigned goods.

## 5. AGREEMENTS CONCERNING ACCOUNTS

**5.1 Location.** The Dealer will give Lender written notice of each office of the Dealer at which records of the Dealer relative to the Accounts are kept. Except where notice is given, all records of the Dealer relative to the Accounts are and will be kept at the Dealership Location.

**5.2 Schedule of Accounts.** Upon request by Lender, the Dealer will, from time to time, deliver to Lender a schedule identifying each Account ("Schedule of Accounts"), together with such schedules and certificates and reports relative to all or any of the Collateral and the items or amounts received by the Dealer in full or partial payment or otherwise, as Proceeds of any of the Collateral. Each Schedule of Accounts or other schedule, certificate or report shall be executed by its duly authorized officer and shall be in the form specified by Lender. Any Schedule of Accounts identifying any Account shall be accompanied, if Lender requests, by a true and correct copy of the invoice evidencing such Account.

**5.3 Perfection of Security Interest.** The Dealer shall take all action that may be necessary or desirable, or that Lender may otherwise reasonably request, so as at all times to maintain the validity, perfection, enforceability and priority of Lender's security interest in the Collateral or to enable Lender to protect, exercise or enforce its rights hereunder and in the Collateral, including, but not limited to:

(a) immediately discharging all Liens other than Permitted Encumbrances;

(b) using commercially reasonable efforts to obtain applicable Waivers, as Lender may reasonably request;

(c) delivering to Lender, endorsed or accompanied by Instruments of assignment as Lender may specify, and stamping or marking, in a manner acceptable to Lender, any and all Chattel Paper, Instruments, Letters of Credit and advices and documents evidencing or forming a part of the Collateral;

(d) entering into lockbox, warehousing and other custodial arrangements reasonably satisfactory to Lender;

(e) executing and delivering control agreements, instruments of pledge, notices, assignments and lockbox arrangements, in each case in form and substance reasonably satisfactory to Lender, relating to the creation, validity, perfection, maintenance or continuation of Lender's security interest in Collateral under the Uniform Commercial Code or other applicable law; and

(f) by the signature of its authorized representative below, Dealer authorizes Lender to file against Dealer, one or more financing, continuation, or amendment statements to perfect Liens in the Collateral securing the Obligations in form and substance satisfactory to Lender (which may describe the Collateral with such words as "all assets" or other words of similar effect).

All charges, expenses and fees Lender may incur in perfecting, maintaining and perfecting its security interests and any taxes relating to those activities, shall be charged to the Dealer, added to the Obligations, or, at Lender's option, shall be paid to Lender immediately upon demand. Dealer shall mark its books and records as may be necessary or appropriate to evidence, protect and perfect Lender's security interest and shall cause its Financial Statements to reflect Lender's security interest.

**5.4 Assignment of Security Interests.** If, at any time the Dealer shall take and perfect a security interest in any property of an Account Debtor or any other Person to secure payment or performance of an Account, the Dealer shall promptly assign that security interest to Lender.

## 6. AGREEMENTS CONCERNING CERTAIN COLLATERAL

**6.1 After-Acquired Intellectual Property.** If the Dealer obtains rights to any new Intellectual Property, the provisions of this Agreement shall automatically apply. With respect to any new applications for Intellectual Property, the issuance of any new registration for Intellectual Property, and any renewals or extensions, the Dealer shall give Lender prompt written notice in writing.

**6.2 Supplemental Documentation.** Concurrently with the execution of this Agreement, and upon request of Lender, the Dealer shall execute and

deliver to Lender supplemental agreements relating to any registered patents, trademarks, tradenames, copyrights and applications, in a form satisfactory to Lender and suitable for recording in the records of the registering Governmental Authority.

**6.3 Contracts and Leases.** The Dealer shall perform, when due, each of its obligations under all contracts, leases and other agreements (including, without limitation, all license agreements) to which the Dealer is a party, and, immediately upon learning of any material default by any party under any such contract, lease or other agreement, the Dealer shall give written notice to Lender, together with a description as to the nature and status. After the occurrence of any Default or Unmatured Default, the Dealer shall not amend, modify, supplement or otherwise agree to any change in any contract, lease or other agreement or waive any provision, without the prior written consent of Lender.

**6.4 Deposit Accounts.** The Dealer will, upon Lender's request:

(a) cause each bank or other financial institution in which it maintains:

(i) a Deposit Account to enter into a control agreement with Lender, in form and substance satisfactory to Lender in order to give Lender Control of the Deposit Account or

(ii) other deposits (general or special, time or demand, provisional or final) to be notified of the security interest granted to Lender hereunder and cause each such bank or other financial institution to acknowledge such notification in writing; and

(b) deliver to each bank or financial institution a letter, in form and substance acceptable to Lender, transferring ownership of the Deposit Account to Lender or transferring dominion and control over each other deposit to Lender.

**6.5 Letter-of-Credit Rights.** The Dealer will, upon Lender's request, cause each issuer of a letter-of-credit to consent to the assignment of Proceeds of the letter-of-credit in order to give Lender Control of the letter-of-credit rights.

**6.6 Uncertificated Securities.** The Dealer will permit Lender to cause the appropriate issuers (and, if held with a securities intermediary, such securities intermediary) of uncertificated securities which are Collateral to mark their books and records with the numbers and face amounts of all uncertificated securities and rollovers and replacements to reflect the Lien of Lender granted pursuant to this Agreement. The Dealer will take any actions necessary to cause the issuers of uncertificated securities which are Collateral and which are Securities to cause Lender to have and retain Control over pledged securities.

## 7. AGREEMENTS CONCERNING INVENTORY

**7.1 Locations.** Dealer shall keep Lender-Financed Inventory only at its Dealership Location and shall not remove Lender-Financed Inventory for a period exceeding twenty-four (24) hours, unless such item of Lender-Financed Inventory is the subject of a daily rental agreement, rent-to-own agreement, lease here/pay here agreement, retail installment sales contract, or otherwise authorized in writing by Lender.

**7.2 Sales of Inventory.** Dealer shall sell, lease, or rent Lender-Financed Inventory only in the ordinary course of the Dealer's business and not dispose of such Lender-Financed Inventory, except as provided in this Agreement.

**7.3 Condition of Inventory; Insurance.** Dealer shall keep all Inventory in good order and condition and shall maintain full, accurate and complete books and records with respect to Inventory at all times. Dealer shall keep all Lender-Financed Inventory insured against all physical risks in amounts and under policies issued by an insurance company as are deemed necessary and satisfactory to Lender. Lender shall be named a "loss payee" on all policies to the extent Lender's interest may apply. In the event Dealer fails to procure, maintain or provide proof of insurance coverage, Lender may, in its sole discretion, purchase insurance necessary to protect its interest and collect the costs from Dealer. Dealer shall keep Lender-Financed Inventory held for rent-to-own or lease here/pay here covered by an adequate service contract or warranty acceptable to Lender and shall

keep Lender-Financed Inventory equipped with a global positioning system unit that is acceptable to Lender and is in working condition at all times.

**7.4 Warehousemen and Landlords.** Dealer shall not store any material portion of its Inventory with any bailee, warehouseman, or similar party without Lender's prior written consent. If Inventory is so stored, Dealer will, concurrently with storing such Inventory, cause the bailee, warehouseman, or similar party to issue and deliver to Lender, in a form acceptable to Lender, warehouse receipts in Lender's name evidencing the storage of the Inventory. The Dealer shall provide Lender with copies of all agreements between the Dealer and any bailee, warehouseman, or similar party and shall deliver to Lender a landlord's or warehouseman's lien waiver in a form acceptable to Lender, prior to entering into any material lease for warehouse storage or business facilities.

**7.5 Consigned Inventory.** If at any time any of the Inventory is placed by the Dealer on consignment with any consignee, Dealer shall, prior to delivery of such consigned Inventory:

(a) provide Lender with all consignment agreements and other Instruments and documentation to be used in connection with such consignment (all of which shall be in a form acceptable to Lender);

(b) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the consignee as debtor, the Dealer as secured party, and Lender as assignee of the secured party;

(c) prepare, execute and file appropriate financing statements with respect to any consigned Inventory showing the Dealer, as debtor, and Lender, as secured party;

(d) conduct a search of all UCC filings made against the consignee and all jurisdictions in which Inventory to be consigned is to be located while on consignment, and furnish copies of such results to Lender; and

(e) notify in writing all creditors of the consignee that are or may be holders of security Interests in the Inventory to be consigned that the Dealer expects to deliver certain Inventory to the consignee in a form acceptable to Lender.

(f) appoint, at Lender's sole discretion, Lender through Lender's authorized employees and agents, to act as Dealer's agent to fill out, complete and sign all papers and documents that may be necessary or helpful to complete items listed in subsections (b) - (e); however, nothing herein shall negate Dealer's responsibility to insure the correct filing of the appropriate financing statements to protects its rights in the Inventory or to execute the appropriate consignment agreements, and Dealer hereby holds Lender harmless for any negligence in Lender's execution of the items listed in subsections (b)-(e) or in providing consignment agreements to Dealer that may be acceptable to Lender.

**7.6 Inspection.** Dealer shall allow Lender and its representatives to inspect the Lender-Financed Inventory during normal business hours and at other reasonable times and to inspect and make copies of Dealer's books and records. Dealer shall pay Lender upon demand for the costs and expenses incurred by Lender or its representatives for such inspections of Dealer's books and records and audits of Dealer's Lender-Financed Inventory.

**7.7 Trust Account.** Dealer shall hold as a fiduciary all amounts received from the sale of Lender-Financed Inventory in the form as received in trust for the sole benefit of Lender and shall remit funds satisfying all amounts due and owing Lender for the sold item of Lender-Financed Inventory within twenty-four (24) hours of receipt of said funds.

**7.8 Compliance with Law.** Dealer shall substantially comply in all material respects with all federal, state and local laws, regulations, rulings and orders applicable to the Dealer for its assets or business in all respects. Without limiting the generality of the foregoing, Dealer shall comply with all requirements of the federal Fair Labor Standards Act, as amended, in the conduct of its business. Dealer shall notify Lender immediately of any violation by Dealer of the Fair Labor Standards Act.

**8. AGREEMENTS CONCERNING EQUIPMENT AND FIXTURES**

**8.1 Equipment Locations.** Dealer will give Lender written notice of each location at which Equipment is or will be kept at all times.

**8.2 Equipment Condition.** The Dealer will keep the Equipment in good order and repair, ordinary wear and tear excepted, and will not waste or destroy the Equipment or any portion thereof, except in the case of obsolete Equipment which is no longer used or useful in Dealer's business.

**8.3 Titled Equipment.** If Dealer has or acquires any vehicles, aircraft, watercraft, or other Equipment for which a certificate of title has been issued by a Governmental Authority, the Dealer shall immediately deliver to Lender, property endorsed, each certificate of title or application for title or other evidence of ownership for each item of Equipment, and the Dealer shall take all actions necessary to have Lender's security interest properly recorded on each certificate of title and shall take all other steps necessary to perfect Lender's security interest in the Equipment.

**8.4 Compliance with Laws.** The Dealer will not use the Equipment in violation of any statute, rule, regulation or ordinance or any policy of insurance. Dealer will neither use the Equipment nor permit the Equipment to be used, for any unlawful purpose or contrary to any statute, law, ordinance or regulation relating to the registration, use, operation or control of the Equipment.

**8.5 Transfers of Equipment.** Dealer may from time to time substitute Equipment, provided that:

(a) the substituted Equipment is not subject to any lien or other encumbrance and has a fair market value at least equal to the fair market of the Equipment for which it is substituted;

(b) the marketability and operating integrity of Dealer's Equipment after such substitution is not impaired,

(c) the Equipment substituted for is no longer used or useful in the operation of Dealer's business and is sold in arm's length transaction in exchange for money or monies' worth at least equal to the fair market value of such Equipment substituted for; and

(d) no Default or Unmatured Default has occurred and is continuing.

**8.6 Fixtures.** The Dealer shall not permit any item of Equipment to become a fixture to real estate or an accession to any other property not subject to Lender's security interest without the prior written consent of Lender. If any Equipment is or will be attached to real estate in such a manner as to become a fixture and the real estate is encumbered, the Dealer will obtain from the holder of the encumbrance a written consent and subordination to the security interest granted, or a written disclaimer of any interest in the Collateral, in a form acceptable to Lender.

**9. GENERAL PROVISIONS CONCERNING COLLATERAL**

**9.1 Title to After-Acquired Collateral.** All Collateral acquired after the date of the Agreement will be acquired by the Dealer free and clear of any lien, security interest or encumbrance, except Permitted Encumbrances.

**9.2 Further Assurances.** The Dealer agrees to do such reasonable acts and things and deliver or cause to be delivered such other Documents as Lender may deem necessary to establish and maintain a valid security interest in the Collateral (free of all other liens and claims except Permitted Encumbrances) to secure the payment and performance of the Obligations and to defend title to the Collateral against any Person claiming any interest therein adverse to Lender. The Dealer authorizes Lender, at the expense of the Dealer, to execute and file a financing statement or statements on its behalf in those public offices deemed advisable or necessary by Lender to protect the security interests of Lender. If permitted by law, the Dealer agrees that a reproduction of this Agreement or of a financing statement may be filed with the financing statement.

**9.3 Insurance.**

(a) The Dealer shall have and maintain at all times, with respect to Inventory and Equipment, insurance written by companies acceptable to Lender covering risks customarily insured against by companies engaged in business similar to that of the Dealer in

reasonable amounts, containing terms customarily maintained by companies engaged in business similar to that of the Dealer. Such insurance shall be payable to the Dealer and Lender as their interests may appear.

(b) In addition to the insurance requirements set forth in Section 9.3(a), the Dealer will carry any other insurance and amounts for periods as may be reasonably required by Lender, and will deliver to Lender, not less than five (5) days prior to the expiration of any policy of insurance, renewals or new policies in like amounts covering the same risks.

(c) All insurance policies shall carry standard, non-contributory lender's loss payable clauses and breach of warranty endorsements in favor of Lender. The insurance certificates evidencing the Dealer's compliance shall be deposited with Lender, and in the event the Dealer fails to file and maintain insurance, Lender may, at its option, purchase insurance and the cost of that insurance shall become an Obligation secured by this Agreement and all sums expended shall bear interest at the Default rate of interest set forth in the Agreement until paid. If requested by Lender, the Dealer shall deliver certified copies of the policies to Lender. The Dealer shall pay all insurance premiums promptly when due and shall provide substitute policies of insurance should Lender at any time reject, for reasonable cause, any such policies of insurance furnished by the Dealer. The Dealer assigns to Lender the Proceeds of all insurance, including, without limitation, any premium refunds, to the extent of the Obligations, shall direct the insurer to make payment of any losses or refunds directly to Lender and appoints Lender its attorney-in-fact to endorse any draft, check or other form of payment made by its insurers.

9.4 Collection of Collateral. The Dealer will, at its own expense, collect all amounts due with respect to any Collateral including taking action with respect to collection as Lender may reasonably request or, in the absence of such request, as the Dealer may deem advisable.

9.5 Lender May Defend Title. In the event the Dealer fails to pay any taxes, assessments, premiums, or fees, or fails to discharge any liens or claims against the Collateral required to be paid or discharged by the Dealer, or fails to purchase, maintain and file with Lender any insurance required by this Agreement, or if any insurance is inappropriate to the situation, in Lender's reasonable discretion, Lender may, without demand or notice, pay any taxes, assessments, premiums or fees, or pay, acquire, satisfy or discharge any liens or claims asserted against the Collateral (without any obligation to determine the validity thereof), or purchase any insurance. All sums expended by Lender shall become an Obligation secured by this Agreement and shall bear interest at the highest default rate of interest set forth in the Agreement until paid.

9.6 Negotiable Collateral. If any Collateral, including Proceeds, consists of a letter of credit, advice of credit, certificate of deposit, negotiable instrument, chattel paper or similar property, the Dealer shall, immediately upon receipt, endorse and assign the Collateral to Lender, deliver actual physical possession to Lender and prior to delivery, shall hold property in trust for Lender. The Dealer will give Lender written notice each time it acquires additional negotiable Collateral.

9.7 Contracts. The Dealer shall remain liable to perform its obligations under any contracts included in the Collateral as though this Agreement had not been entered and Lender shall not incur any obligation under any contracts by reason of this Agreement.

9.8 Accounting System. Dealer shall maintain a standard and modern system of accounting in accordance with GAAP which contains information pertaining to the Collateral that may from time to time be requested by Lender.

9.9 Inspection of Collateral and Records. During Dealer's usual business hours, Lender may inspect and examine the Collateral and check and test the same as to quality, quantity, value, and condition. Lender shall also have the right at any time, during Dealer's usual business hours or during the usual business hours of any third party having control over the records of the Dealer, to inspect Dealer's books and records in order to verify the amount, condition of or any other matter relating to the Collateral and Dealer's financial condition and to copy Dealer's books and records. Dealer waives the right to assert a confidential relationship, if any, it may have with any accounting firm in connection with any information

requested by Lender and agrees that Lender may directly contact any accounting firm in order to obtain information.

9.10 Transfer of Collateral. Dealer shall not sell, lease, license, transfer or otherwise dispose of any interest in any Collateral except:

(a) sales of Inventory in the ordinary course of business,

(b) licenses and other dispositions of Intellectual Property in the ordinary course of business pursuant, and

(c) dispositions of Equipment in accordance with Section 8.5.

10. EVENTS OF DEFAULT

10.1 Events of Default. The occurrence of any of the following events shall be considered an Event of Default:

(a) The Dealer fails to perform any of its Obligations, undertakings, or covenants under this Agreement, including, but not limited to, failing to make an installment of principal or interest under this Agreement when due or upon demand; or

(b) Any warranty or representation made by the Dealer is found to have been false or misleading in any material respect when made, or any schedule, certificate, Financial Statement, report, notice, or other writing furnished by the Dealer to Lender is found to have been false or misleading in any material respect when made or delivered; or

(c) Any damage or destruction of a part of the collateral securing this Agreement occurs and appropriate insurance naming Lender as "Loss Payee" is not in place; or

(d) The Dealer or any Guarantor becomes insolvent or generally fails to pay, or admits in writing its inability to pay, its debts as they become due; or the Dealer applies for, consents to, or acquiesces in the appointment of, a trustee, receiver or other custodian for the Dealer or any property of the Dealer, or makes a general assignment for the benefit of creditors; or, in the absence of an application, consent or acquiescence, a trustee, receiver or other custodian is appointed involuntarily for the Dealer or for a substantial part of the property of the Dealer; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceedings is commenced in respect of the Dealer; or

(e) Any material change in management, ownership, or control of the Dealer occurs without the prior written consent of Lender; or

(f) The voluntary or administrative dissolution, death, change of ownership or control of the Dealer; or

(g) Lender, in good faith, deems itself insecure for any reason; or

(h) Dealer breaches any term or provision of this Agreement

11. REMEDIES

11.1 Remedies Generally. Upon the occurrence of any Event of Default and at any time after an Event of Default, Lender may, at its option and without notice exercise any and all of its rights in a separate, successive or concurrent fashion and such exercise of any right shall not preclude pursuit of other rights and remedies at a later time.

11.2 Acceleration. Lender shall have the right to demand immediate payment of the Obligations under the Agreement and this Agreement and all other Indebtedness owed to Lender by Dealer.

11.3 Power of Sale. Lender shall have all rights and remedies available at law or in equity including, without limitation, the rights and remedies of a secured party under the Texas Uniform Commercial Code, as in effect from time to time (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including, without limitation, the right to take possession of the Collateral, and for that purpose Lender may, so far as the Dealer can give authority, enter upon any premises on which the Collateral may be situated and remove the Collateral. At Lender's request and to the extent Dealer may lawfully do so, Dealer shall assemble, prepare for removal, and make available to Lender at a

place designated by Lender which is reasonably convenient to Lender and Dealer, such items of Collateral as Lender may deem sufficient to cover all of Dealer's Obligations to Lender. Dealer agrees that the Collateral is of the type customarily sold on a recognized market and that Lender has no obligation to notify Dealer prior to a sale. Dealer agrees that ten (10) days' prior written notice of the time and place of any public sale of Collateral or of the time after which any private sale or any other intended disposition is to be made is reasonable. Dealer agrees that private sale of any item financed by Lender at the amount owed to Lender on that item, less costs reasonably incurred by Lender in preparation of disposition of the Collateral, shall constitute a commercially reasonable method of disposition of that Collateral. Lender may in its discretion transfer any securities or other property constituting Collateral into its own name or that of its nominee and receive the income and hold the same as security for Obligations or apply it on principal or interest due on Obligations. In the event that Lender takes possession of any Intellectual Property, the goodwill associated with any trademarks, tradenames, trade dress, and service marks of the Dealer shall be transferred to Lender.

**11.4 Advances and Deposits.** Lender shall have the right to cancel any unfunded Advances. Any Deposit Accounts, deposits or other sums credited by or due from Lender to the Dealer shall constitute security for the Obligations, and Lender may apply or set-off deposits or other sums against Obligations at any time a Default has occurred and is continuing, and whether or not the Obligations are then due or other Collateral is considered by Lender to be adequate.

**11.5 Receivership.** Lender shall have the right to initiate proceedings to appoint a receiver in any court of competent jurisdiction. Dealer waives the right to notice and hearing of the appointment of a receiver and consents to the appointment without requiring Lender to post a bond.

**11.6 Claims on Bonds.** To the extent allowed by law, Dealer gives consent to Lender to proceed in any action to collect on or execute against any bonds that Dealer has posted with any governmental authorities.

**11.7 Waiver.** Except as otherwise expressly set forth in this Agreement, to the extent permitted by law, the Dealer waives demand, notice, protest, notice of acceptance of this Agreement, notice of loans made, credit extended, Collateral received or delivered or other action taken in reliance and all other demands and notices of any description. Additionally, to the extent not prohibited by law, Dealer waives all appraisement, valuation, anti-deficiency, homestead, exemption, or usury laws and releases all right to appeal after payment in full. With respect to both the Obligations and Collateral, the Dealer assents to any Extension or postponement of the time of payment or any other indulgence, to any substitution, exchange, or release of Collateral, to the addition or release of any party or person primarily or secondarily liable, to the acceptance of partial payments and any settlement, compromise or adjustment, all in such manner and at such time or times as Lender may deem advisable. Except as otherwise provided by law, Lender shall have no duty as to the collection or protection of the Collateral, or any income it generates, nor as to the preservation of rights against prior parties nor as the preservation of any rights pertaining beyond safe custody. Lender may exercise its rights with respect to Collateral without resorting to or regard to other Collateral or sources of reimbursement for any Obligation. Lender shall not be deemed to have waived any of these rights upon or under Obligations or Collateral unless the waiver be in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of that right or any other right. A waiver on any occasion shall not be construed as a bar to the exercise of any right on any future occasion. All rights and remedies of Lender as to the Obligations or Collateral whether evidenced the Agreement or by any other instrument or papers shall be cumulative and may be exercised alone, successively or together. Lender may, from time to time, without notice to the Dealer:

(a) Retain or obtain a security interest in any property of any other Person, in addition to the Collateral, to secure any of the Obligations;

(b) Retain or obtain the primary or secondary obligation of any party or parties, in addition to the Dealer with respect to any of the Obligations;

(c) Extend or renew for any period (whether or not longer than the original period) or release or compromise any Obligation of any

party or parties primarily or secondarily liable to Lender under the Agreement;

(d) Release its security interest in any of the property securing any of the Obligations and permit any substitution or exchange for any such property; and

(e) Resort to the Collateral for the payment of any of the Obligations whether or not it shall have resorted to any other property or shall have proceeded against any party primarily or secondarily liable for any of the Obligations.

Lender shall not have any Obligation for any error or omission or delay of any kind occurring in the liquidation of any Collateral, including the settlement of or the collection of any Account or for any damage resulting from collection or settlement except liabilities resulting from willful misconduct by Lender.

**11.8 Expenses.** The Dealer shall pay to Lender on demand any and all reasonable out-of-pocket expenses, including reasonable attorneys' fees, incurred or paid by Lender in protecting the Collateral, the existence, perfection or priority of Lender's security interest, or the enforcement of the Loan Documents.

**11.9 Proceeds.** Lender may take control of any funds generated by the Collateral, and in Lender's name or the Dealer's name, demand, collect, receipt for, settle, compromise, sue for, repossess, accept returns of, foreclose or realize upon any Collateral. After deducting all expenses, the residue of any Proceeds of collection or sale of the Collateral shall be applied to the payment of principal or interest on the Obligations in such order of preference as Lender may determine, proper allowance for interest on the Obligations not then due being made, and any excess shall be returned to the Dealer.

**11.10 Power of Attorney.** The Dealer irrevocably appoints Lender and Lender's designees as its true and lawful attorneys-in-fact, with full power of substitution in the premises to act with or without the occurrence of a Default and with or without notice to Dealer to:

(a) act with general authority and delegate such authority with respect to all Dealer's Collateral and all transactions relating thereto;

(b) execute agreements and related Documents necessary for Dealer to acquire or sell Collateral;

(c) endorse any document, instrument, certificate of title or other evidence of title, state registration Documents, or related Documents necessary to protect the Collateral in the name of Dealer;

(d) demand, collect receipt for, settle, compromise, adjust, sue for, foreclose or realize upon the Collateral or Chattel Paper related to the Collateral or any insurance claims thereon in such manner as Lender may determine, whether or not the Collateral is then due;

(e) receive, open, and dispose of mail addressed to the Dealer;

(f) endorse in the name of and on behalf of Dealer any Chattel Paper, invoice, bill of sale, document, instrument or bill of lading relating to the Collateral;

(g) sign and send on behalf of the Dealer any invoice or bill of lading relating to any Account, on drafts against customers, on schedules and assignments of Accounts, on notices of assignment, financing statements and other public records, on verifications of Accounts and on notices to customers;

(h) sign the Dealer's name to proofs of claim against any Account Debtor on behalf of the Dealer;

(i) notify the post office to change the address for delivery of the Dealer's mail to an address designated by Lender;

(j) endorse Dealer's name on all applications, Documents, papers, certificates and Instruments necessary or expedient for Lender to use the Intellectual Property, or necessary or expedient to grant or issue any exclusive or nonexclusive license under the Intellectual Property to anyone else, or necessary or expedient for Lender to assign, pledge, convey or otherwise transfer title in, or dispose of, the Intellectual Property to anyone else, for the purpose of recording,

registering, filing or accomplishing any other formula with respect to the Intellectual Property, and

    (k)  do all things necessary to satisfy Dealer's obligations, Obligations and carry out this Agreement.

The Dealer ratifies and approves all acts of Lender's attorneys. Neither Lender nor any attorney will be liable for any acts or omissions nor for any error of judgment or mistake of fact or law, absent gross negligence, bad faith or willful misconduct. This power, being coupled with an interest, is irrevocable until the Obligations have been fully satisfied. Notwithstanding anything to the contrary, no attorney acting pursuant to this Section 11.10 shall have any authority to confess judgment on behalf of the Dealer.

11.11 License. Dealer grants to Lender a license to use, without charge, Dealer's Intellectual Property and other Collateral in completing production of, advertising for sale, or selling any Collateral after any Default, and all of the Dealer's rights under all licenses and franchise agreements shall, in such event, inure to Lender's benefit. In addition, the Dealer shall, upon request by Lender, make available such personnel in Dealer's employ on the date of any Default as Lender may reasonably designate to permit Lender to continue, directly or indirectly, to produce, advertise and sell the Collateral sold by the Dealer under any Intellectual Property or license. The license shall include the right of Lender to use, assign, license or sublicense any of the Dealer's Intellectual Property, including in the license reasonable access as to all media in which any of the licensed items may be recorded or stored; provided that, Lender shall comply with all pre-existing quality control standards and trademark use requirements of the Dealer. No agreements entered into by the Dealer shall prohibit, restrict or impair the rights of Lender granted hereunder.

11.12 Reinstatement. If, at any time after payment in full by the Dealer of all Obligations and termination of Lender's security interest, any payments on the Obligations previously made by the Dealer or any other Person are disgorged by Lender for any reason whatsoever, including, without limitation, the insolvency, bankruptcy or reorganization of the Dealer or such Person, this Agreement and Lender's security interests shall be reinstated as to all disgorged payments as though such payments had not been made, and the Dealer shall sign and deliver to Lender all Documents, and shall do such other acts and things, as may be necessary to perfect Lender's security interest.

11.13 No Marshaling. The Dealer, on its own behalf and on behalf of its successors and assigns, expressly waives all rights, if any, to require a marshaling of assets by Lender or to require Lender's first resort to some or any portion of the Collateral before foreclosing upon, selling or otherwise realizing on any other portion.

11.14 Other Rights. To the extent Lender has any rights and remedies against Dealer pursuant to any other agreements between Lender and Dealer, those rights and remedies shall be in addition to, not in lieu of, the rights and remedies provided for under this Agreement.

12. MISCELLANEOUS PROVISIONS

12.1 Assignment. This Agreement may be assigned by Lender but Dealer may not assign this Agreement without the prior written consent of Lender.

12.2 Amendment, Modification and Merger. This Agreement and all documents incorporated by reference are intended by the parties as an amendment and restatement of any prior agreements between Lender and Dealer. With the exception of the Lender's right to make amendments and modifications to the terms and conditions set forth above, this Agreement may not be modified or amended except upon the written consent of Lender and Dealer.

12.3 Execution. The parties understand and agree that Lender may execute this Agreement and all corresponding Documents by affixing an authorized Lender Officer's signature via signature stamp. Dealer may only execute this Agreement by original signature. A facsimile or other electronic reproduction of such authorized Lender Officer's signature and Dealer's signature on the Agreement and all corresponding Documents shall be deemed original signatures.

12.4 Notices. All notices, requests and demands to or upon the respective parties, including service of process of any legal proceeding initiated by

either party, shall be deemed to have been duly given or made: if by hand or by facsimile, immediately upon the Business Day of receipt, if received before 5:00 p.m., recipient's time, otherwise on the next Business Day; if by Federal Express, Express Mail or any other overnight delivery service with proof of next day delivery on a Business Day, one (1) Business Day after dispatch; and if mailed by certified mail, return receipt requested, five (5) days after mailing. All notices, requests and demands are to be given or made to the Dealer at the address disclosed in the Term Sheet and to Lender at 219 North Loop 12, Irving, TX 75061.

12.5 No Waiver. No failure or delay by Lender in exercising any right, power, or privilege under this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege, or the exercise of any other right, power, or privilege.

12.6 Termination. No termination of this Agreement shall alter Dealer's Obligations relating to amounts funded or committed prior to the effective date of such termination, and all rights and remedies, including without limitation, the security interest and the rights of Lender as a secured party, shall extend until all Obligations owed by Dealer to Lender have been satisfied.

12.7 Acceptance and Governing Law. This Agreement shall not be effective unless and until accepted by execution by an officer of Lender at the address in the State of Texas set forth in the first sentence of this Agreement. This Agreement and all rights and obligations, including matters of construction, validity and performance, shall be governed by the Uniform Commercial Code and other applicable laws of the State of Texas, without regard to conflict of law principles. However, in the event Dealer's Location is in the State of California, the validity, enforceability and interpretation of the Note and this Guaranty shall be governed by the laws of the State of California without regard to conflicts of laws provisions thereof, and each Advance shall be deemed made pursuant to and under the authority of a license issued under the California Finance Lenders Laws.

12.8 Legal Fees and Collection Costs. Dealer shall pay to Lender all reasonable legal fees, expenses and collection costs incurred as a result of Dealer's Default or failure to perform any Obligation under this Agreement.

12.9 Indemnification. Dealer shall indemnify and hold Lender harmless from and against all loss, damage, costs, or expenses of any nature relating to claims of third parties arising from or in any way connected to this Agreement or Dealer's business affairs including, without limitation, attorneys' fees and expenses incurred both in the defense of any action against Lender and in any action to enforce these indemnity rights as against the Dealer.

12.10 No Joint Venture or Partnership. Nothing contained in this Agreement shall confer upon Lender or Dealer any interest in, or subject either of them to any obligation for, or in respect of the business, assets, profits, losses or obligations of the other. This Agreement does not constitute and shall not be characterized as a joint venture or partnership between Lender and Dealer. Nothing in this section shall limit or restrict the respective obligations and undertakings of Lender and Dealer hereunder.

12.11 Priority. Unless otherwise expressly provided, the security interest created by this Agreement shall be pro rata on par with any prior security interests in the Collateral now existing in favor of Lender.

12.12 Reserve Account. If disclosed in the Term Sheet, the Dealer shall be required to maintain a Reserve Account with Lender as additional security for performance of Dealer's obligations. The funds maintained in the Reserve Account shall be returned to Dealer within thirty (30) days after the later of receipt of written request for return by Lender or satisfaction of Dealer's Obligations to Lender and termination of this Agreement by Dealer. The reserve amount per Advance will be a set dollar amount as set forth on the Term Sheet. In the event that no Term Sheet is executed or the executed Term Sheet fails to disclose the reserve amount, the reserve amount shall be $75.00 per Advance.

12.13 Set-Off. Lender is authorized at any time, without notice to Dealer, to set-off and apply, directly or through any of Lender's affiliates any deposits (whether general or special, time or demand, provisional or final) and other assets and properties at any time held in the possession, custody

or control of Lender or its affiliates or any indebtedness owed Dealer by Lender or its affiliates, towards any of Dealer's Obligations.

**12.14 Statement of Accounts.** Any statement of Dealer's account furnished to Dealer by Lender, to the extent no objection is made in writing by Dealer within thirty (30) days after receipt of such statement, shall constitute a definitive statement of Dealer's Obligations as of the date of the statement and shall be binding upon the Dealer.

**12.15 Competency.** Dealer and all Guarantors are competent to enter into this Agreement and have the legal authority to enter into and execute this Agreement and all other Loan Documents.

**12.16 Confidentiality.** Dealer shall not disclose to any third party, without the prior written consent of Lender, any terms and conditions applicable to this Agreement, regardless of where the terms and conditions appear.

**12.17 Communications.** Dealer expressly authorizes and agrees to accept all mailings, facsimile transmissions and telephonic transmissions from Lender including, without limitation, credit information and promotional materials. Dealer may establish an account with Lender where information can be accessed and transmissions can be sent through Lender's website. Dealer shall have the means to control access to the account information by passwords and a dealer account number in accordance with the policies and procedures set forth by Lender. To participate, Dealer shall execute all Documents required by Lender to register for such additional service and shall abide by Lender's policies and procedures. Dealer agrees that the online documents shall be incorporated by reference and made a part of this Agreement.

**12.18 Severability.** Whenever possible each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of that prohibition without invalidating the remainder of the provision or the remaining provisions of this Agreement. The Dealer recognizes that Lender has relied on this Agreement in extending credit to the Dealer and agrees that such reliance by Lender shall be sufficient consideration for this Agreement.

**12.19 Binding on Successors.** The rights and privileges of Lender shall inure to the benefit of its respective successors and assigns.

**12.20 Jurisdiction and Venue.** Dealer submits to the personal jurisdiction and venue of the state or federal courts of Dallas County, Texas and agrees that any and all claims or disputes pertaining to this Agreement or to any matters arising out of or related to this Agreement initiated by Dealer against Lender shall be brought in the state or federal courts located in Dallas County, Texas. Further, Dealer expressly consents to jurisdiction and venue of the state or federal courts in located in Dallas County, Texas as to any action brought in such court by Lender and waives any claim of inconvenient forum. Lender reserves the right to initiate and prosecute any action against Dealer in any court of competent jurisdiction, and Dealer consents to the forum as Lender may elect. However, in the event that this Agreement is made and entered into in the State of California, the state or federal courts located in the State of California shall have jurisdiction to hear and determine any claims or disputes between the parties pertaining to this Agreement or to any matter arising out of or related to this Agreement.

**12.21 Waiver of Bond.** Dealer waives, to the extent permitted by law, any bond or surety or security on such bond which might, but for this waiver, be required of Lender.

**12.22 Waiver Of Jury Trial.** LENDER AND DEALER, AFTER CONSULTING OR HAVING HAD THE OPPORTUNITY TO CONSULT WITH COUNSEL, KNOWINGLY, VOLUNTARILY, INTENTIONALLY, IRREVOCABLY AND UNCONDITIONALLY WAIVE ANY RIGHT EITHER OF THEM MAY HAVE TO A TRIAL BY JURY IN ANY LITIGATION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY COURSE OF CONDUCT, DEALING, STATEMENTS (WHETHER ORAL OR WRITTEN), OR ACTIONS OF EITHER OF THEM. NEITHER LENDER NOR DEALER SHALL SEEK TO CONSOLIDATE BY COUNTERCLAIM OR OTHERWISE, ANY ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED. THESE PROVISIONS SHALL NOT BE DEEMED TO HAVE BEEN MODIFIED IN ANY RESPECT OR RELINQUISHED BY EITHER LENDER OR DEALER

EXCEPT BY A WRITTEN INSTRUMENT EXECUTED BY BOTH OF THEM. THIS PROVISION IS A MATERIAL INDUCEMENT TO LENDER TO ACCEPT THIS AGREEMENT.

**12.23 JUDICIAL REFERENCE.** IF DEALER'S LOCATION IS WITHIN THE STATE OF CALIFORNIA, THE FOLLOWING PROVISIONS APPLY:

IN THE EVENT THAT ANY LEGAL PROCEEDING IS FILED IN A COURT OF THE STATE OF CALIFORNIA (THE "COURT") BY OR AGAINST ANY PARTY IN CONNECTION WITH ANY CONTROVERSY, DISPUTE OR CLAIM DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (EACH A "CLAIM") AND THE WAIVER SET FORTH IN THE PRECEDING SECTION IS NOT ENFORCEABLE IN SUCH ACTION OR PROCEEDING, DEALER AND LENDER HEREBY AGREE AS FOLLOWS:

(A) WITH THE EXCEPTION OF THE MATTERS SPECIFIED IN SUBPARAGRAPH B BELOW, ANY CLAIM WILL BE RESOLVED BY A GENERAL REFERENCE PROCEEDING IN ACCORDANCE WITH THE PROVISIONS OF CALIFORNIA CODE OF CIVIL PROCEDURE SECTIONS 638 THROUGH 645.1.

(B) THE FOLLOWING MATTERS SHALL NOT BE SUBJECT TO A REFERENCE PROCEEDING: (1) EXERCISE OF SELF-HELP REMEDIES (INCLUDING SET OFF), (2) APPOINTMENT OF A RECEIVER, AND (3) TEMPORARY, PROVISIONAL OR ANCILLARY REMEDIES (INCLUDING WRITS OF ATTACHMENT, WRITS OF POSSESSION, TEMPORARY RESTRAINING ORDERS OR PRELIMINARY INJUNCTIONS). THIS AGREEMENT DOES NOT LIMIT THE RIGHT OF ANY PARTY TO EXERCISE OR OPPOSE ANY OF THE RIGHTS AND REMEDIES DESCRIBED IN CLAUSES (1) - (3) AND ANY SUCH EXERCISE OR OPPOSITION DOES NOT WAIVE THE RIGHT OF ANY PARTY TO A REFERENCE PROCEEDING PURSUANT TO THIS AGREEMENT.

(C) UPON THE WRITTEN REQUEST OF ANY PARTY, THE PARTIES SHALL SELECT A SINGLE REFEREE, WHO SHALL BE A RETIRED JUDGE OR JUSTICE. IF THE PARTIES DO NOT AGREE UPON A REFEREE WITHIN TEN DAYS OF SUCH WRITTEN REQUEST, THEN, ANY PARTY MAY REQUEST THE COURT TO APPOINT A REFEREE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 640(B). A REQUEST FOR APPOINTMENT OF A REFEREE MAY BE HEARD ON AN EX PARTE OR EXPEDITED BASIS, AND THE PARTIES AGREE THAT IRREPARABLE HARM WOULD RESULT IF EX PARTE RELIEF IS NOT GRANTED,

(D) ALL PROCEEDINGS AND HEARINGS CONDUCTED BEFORE THE REFEREE, EXCEPT FOR TRIAL, SHALL BE CONDUCTED WITHOUT A COURT REPORTER, EXCEPT WHEN ANY PARTY SO REQUESTS, A COURT REPORTER WILL BE USED AND THE REFEREE WILL BE PROVIDED A COURTESY COPY OF THE TRANSCRIPT. THE PARTY MAKING SUCH REQUEST SHALL HAVE THE OBLIGATION TO ARRANGE FOR AND PAY COSTS OF THE COURT REPORTER, PROVIDED THAT SUCH COSTS, ALONG WITH THE REFEREE'S FEES, SHALL ULTIMATELY BE BORNE BY THE PARTY WHO DOES NOT PREVAIL, AS DETERMINED BY THE REFEREE.

(E) THE REFEREE SHALL APPLY THE RULES OF DISCOVERY AND EVIDENCE APPLICABLE TO PROCEEDINGS AT LAW IN THE STATE OF CALIFORNIA TO THE REFERENCE PROCEEDING AND SHALL DETERMINE ALL ISSUES IN ACCORDANCE WITH APPLICABLE LAW. THE REFEREE SHALL BE EMPOWERED TO ENTER EQUITABLE AS WELL AS LEGAL RELIEF AND RULE ON ANY MOTION WHICH WOULD BE AUTHORIZED IN A TRIAL, INCLUDING MOTIONS FOR DEFAULT JUDGMENT OR SUMMARY JUDGMENT. THE REFEREE SHALL REPORT THE REFEREE'S DECISION, WHICH REPORT SHALL ALSO INCLUDE FINDINGS OF FACT AND CONCLUSIONS OF LAW.

**12.24 USURY.** Notwithstanding any provisions of this Agreement to the contrary, at no time shall Dealer be obligated to pay interest at a rate which

would subject Lender to either civil or criminal liability due to interest being in excess of the maximum rate Lender is permitted by law to contract or Dealer is permitted by law to agree to pay. In such circumstances, the rate of interest hereunder shall be deemed to be immediately reduced to such maximum rate, and such interest and the portion of all prior interest payments in excess of such maximum rate shall be applied and shall be deemed to have been payments in reduction of the principal balance of the Obligations as of the date such payment was made. Any such excess shall be held by Lender for Dealer's benefit without interest and shall be subject to setoff by Lender.

## 13. DEFINITIONS

"Account Debtor" shall mean any Person who has Indebtedness to the Dealer.

"Accounts", "Inventory", "Fixtures", "General Intangibles", "Chattel Paper", "Documents", "Goods", "Deposit Accounts", "Instruments", "Inventory", "Investment Property" and "Proceeds" shall mean all of Dealer's such property within the meanings ascribed in the Uniform Commercial Code, as adopted and as in effect from time to time in the state of Texas.

"ACH" shall mean all payments made by, or on behalf of, Dealer to Lender via a nationwide electronic funds transfer network processing electronic debit entries from Dealer's bank Accounts pursuant to the ACH Authorization Form executed contemporaneously herewith.

"ACH Authorization Form" shall mean the document signed by the Dealer authorizing payment via ACH.

"Advance" shall mean any loan or payment in any amount made pursuant to the Agreement and Term Sheet by Lender to Dealer or on Dealer's behalf to any third party.

"Affiliate" means, with respect to any Person, any other Person (a) directly or indirectly through one or more intermediaries, controlling, controlled by, or under common control with, such Person, or (b) that directly or indirectly owns more than Ten Percent (10%) of any class of the voting securities or capital stock of or equity interests in such Person. A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise.

"Agreement" means this Demand Promissory Note and Security Agreement, as amended from time to time.

"Base Rate" shall mean the greater of the variable rate of interest equal to the most recent prime rate published in the Wall Street Journal or 6%.

"Borrower" shall mean the Dealer and the Guarantors.

"Business Day" shall mean all days on which banks conduct business in Texas.

"Collateral" shall mean all of the Dealer's property or rights in which a security interest is granted hereunder.

"Contract Rate" shall be the rate disclosed in the Term Sheet effective whenever Dealer is in compliance with all its covenants, warranties and Obligations under the Agreement or 5% if no Term Sheet has been signed or a signed Term Sheet has no disclosed rate.

"Control" shall have the meaning ascribed in the Texas Uniform Commercial Code, as in effect from time to time.

"Credit Limit" shall mean the maximum amount Dealer may borrow at any one time under this Agreement.

"Credit Line" shall mean Dealer's floorplan line of credit pursuant to and under this Agreement.

"Curtailment Payment" shall mean the sum Dealer is required to pay Lender to reduce the principal amount due on a unit when the Initial Period and each Extension expires.

"Dealer" shall mean the persons or entities disclosed in this Agreement or the Term Sheet.

"Dealership Location" shall mean that place where the Collateral and Dealer's books and records are kept, where Dealer's operations are conducted from and/or if Dealer is a legally recognized business entity where Dealer's registered office is located.

"Dealer's Home Branch" shall mean the Lender branch location for which the Credit Line is assigned to by Lender for servicing and administration.

"Default" means any of the Events of Defaults specified in Section 10 of this Agreement.

"Default Rate" shall mean that rate of interest as stated in the Term Sheet or, in the event that no Term Sheet has been signed or the signed Term Sheet fails to list a Default Rate, then 12%.

"Equipment" shall mean all furniture, fixtures, machinery, vehicles, aircraft, watercraft, tools, computers and other Goods other than Inventory held for sale, lease, or daily rental by Dealer in the ordinary course of business.

"Event of Default" shall have the meaning set forth in Section 10 of this Agreement.

"Extension" shall mean that grant by Lender to Dealer of additional time that an Advance for an item of Lender-Financed Inventory becomes due and payable.

"Extension Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Facilities" means the Loan and any other credit facility provided by Lender from time to time pursuant to this Agreement.

"Finance Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Financial Statements" shall mean, as the context may require, the financial statements of Dealer furnished from time to time pursuant to this Agreement, hereof, in all cases together with any accompanying Agreements or other disclosures to such financial statements, and any other Documents or data furnished to Lender.

"Float Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Flat Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Floorplan Application" shall mean the information provided by Dealer, its principals and the Guarantors to Lender including, but not limited to, the application form provided by Lender.

"Floorplan Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory. Additionally, in the event no Term Sheet is executed and effective, then the Floorplan Fee shall be equal to One Hundred Fifty Dollars ($150.00).

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time as promulgated by the Financial Accounting Standards Board and recognized and interpreted by the American Institute of Certified Public Accountants.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government, including, without limiting the generality of the foregoing, any agency, body, commission, court or department thereof whether federal, state, local or foreign.

"Guarantors" shall mean Persons who have signed guaranty agreements concerning the Obligations of the Dealer pursuant to this Agreement.

"Indebtedness" of a Person means such Person's: (a) obligations for borrowed money; (b) obligations representing the deferred purchase price of Property or services (other than payable arising in the ordinary course of such Person's business payable on terms customary in the trade); (c) obligations, whether or not assumed, secured by any Lien upon or in Property owned by the subject Person or payable out of the Proceeds or production from Property now or hereafter owned or acquired by such Person; (d) obligations which are

evidenced by Agreements, acceptances, or other Instruments; (e) capitalized lease obligations; (f) indebtedness or other obligations of any other Person for borrowed money or for the deferred purchase price of property or services, the payment or collection of which the subject Person has guaranteed (except by reason of endorsement for collection in the ordinary course of business) or in respect of which the subject Person is liable, contingently or otherwise, including, without limitation, Obligation by way of agreement to purchase, to provide funds for payment, to supply funds to or otherwise to invest in such other Person, or otherwise to assure a creditor against loss; (g) reimbursement or other obligations in connection with letters of credit; (h) obligations in connection with sale and leaseback transactions; (i) any other transaction which is the functional equivalent of, or takes the place of borrowing, but which would not constitute a Obligation on a balance sheet of such Person prepared in accordance with GAAP.

"Initial Period" shall mean shall mean that number of days set forth in the Term Sheet, beginning on the date of an Advance and ending on the Maturity Date, and any Extension thereto, that an item of Lender-Financed Inventory will be financed by Lender to Dealer pursuant to the terms of this Agreement. Additionally, in the event no Term Sheet is executed or the Term Sheet fails to list an Initial Period, then the Period shall be thirty (30) days.

"Intellectual Property" shall mean all intellectual property of the Dealer, including, without limitation: (a) all patents, patent applications, patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (b) all trademarks, service marks, trade dress, trade names, and corporate names and all the goodwill and quality control standards associated therewith; (c) all registered and unregistered statutory and common law copyrights; (d) all registrations, applications and renewals for any of the foregoing; (e) all trade secrets, confidential information, ideas, formulae, compositions, knowhow, manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, improvements, proposals, technical and computer data, financial, business and marketing plans, and customer and supplier lists and related information; (f) all other proprietary rights (including, without limitation, all computer software and documentation and all license agreements and sublicense agreements to and from third parties relating to any of the foregoing); (g) all copies and tangible embodiments of the foregoing in whatever form or medium; (h) all damages and payments for past, present and future infringements of the foregoing; (i) all royalties and income due with respect to the foregoing; and (j) the right to sue and recover for past, present and future infringements of the foregoing.

"Interest" shall mean the aggregate rate of interest which accrues on all Obligations owed by Dealer to Lender under or arising out of the Agreement by combining the Base Rate plus the applicable Contract Rate, Risk Rate or Default Rate.

...... ...... — .... .... .. .... ... .... . .... sale, lease, or rent.

"Lender-Financed Inventory" shall mean any Unit now or after acquired or retained by Dealer using an Advance under the Agreement and Term Sheet.

"Lender-Financed Inventory Obligation" shall mean obligations related to Units acquired by the Dealer using funds advanced by Lender.

"Lender Published Rate, Fee and Term Schedule" shall mean any current schedule of interest rates and fees assessed by Lender, including Base Rate, Contract Rate, Risk Rate, Default Rate, late fees, fees relating to returned checks or ACH payments due to insufficient funds and notice of amendments to terms and conditions published by Lender either at URL www.auctioncredit.com or at its branch offices or locations.

"Letters of Credit" shall mean documents evidencing a third party's obligations to honor drafts or other demands for payment for Obligations of the Dealer.

"Lien" means any lien (statutory or other), security interest, mortgage, pledge, hypothecation, assignment for the purpose of security, deposit arrangement for the purpose of security, encumbrance or preference, priority or other security agreement of any kind or nature whatsoever (including, without limitation, the interest of a vendor or lessor under any conditional sale, capitalized lease or other title retention agreement).

"Loan Fee" shall mean the fee charged by Lender to Dealer set forth on the Term Sheet for each individual item of Lender-Financed Inventory.

"Loans" shall mean, loans from Lender to Dealer in the initial maximum principal amount disclosed in this Agreement and the Term Sheet, or such greater or lesser sum which may be advanced from time to time, governed by this Agreement, including any renewal or Extension thereof.

"Loan Documents" shall mean this Agreement, the Agreement, and any UCC Financing Statements and all other Documents executed and delivered by Dealer incidental to or in connection with the Facilities.

"Material Adverse Effect" shall mean any negative material change in the Dealer's ability to satisfy Dealer's Obligations.

"Maturity Date" shall mean the date an Advance for an item of Lender-Financed Inventory becomes due and payable: provided that, Lender and Dealer agree that all Advances are due immediately upon demand if Lender elects. In the event the Maturity Date relating to a specific Advance for an item of Lender-Financed Inventory becomes due and payable falls on a federal banking holiday, Saturday or Sunday, the Maturity Date for such specific Advance shall be the next business date subsequent to such federal banking holiday, Saturday or Sunday.

"MSO" shall mean the manufacturer's certificate of origin or other document evidencing ownership of a Unit issued by the manufacturer of the Unit.

"Obligations" shall mean any and all Advances, indebtedness, Lender-Financed Inventory Obligations, financial obligations, administrative fees, Interest, Floorplan Fees, NSF fees, Float Fees, Loan Fees, Extension Fees, Finance Fees, late fees, charges, expenses, attorney fees, costs of collection, covenants, and duties owing, arising, due or payable from Dealer to Lender of any kind or nature, present or future, under any instrument, guaranty, or other document whether arising under this Agreement or any other agreement, whether directly or indirectly (including those acquired by assignment), absolute or contingent, primary or secondary, due or to become due, now existing or hereafter arising and however acquired.

"Odometer Disclosure Statement" shall mean the sworn statement disclosing whether the mileage reflected on the odometer of the vehicle is accurate.

"Permitted Encumbrances" are security interests which have been disclosed to Lender and which Lender has given its advanced written content.

"Person" means and includes an individual, a partnership, a joint venture, a corporation, a limited liability company, a trust, an unincorporated association and a Governmental Authority.

"Property" of a Person means any and all property, whether real, personal, tangible, intangible, or mixed, of the Person, or other assets owned, leased or operated by such Person.

"Purchase Money Inventory" shall mean a Unit acquired by Dealer pursuant to an Advance under the Agreement and Term Sheet.

"Risk Rate" shall mean shall mean that rate of interest as stated in the Term Sheet or in the event that no is published and effective, then 6%.

"Schedule of Accounts" shall have the meaning ascribed in Section 5.2.

"Shortage" shall mean the difference between a payment received by Lender and the amount owing, arising, due, or payable from Dealer to Lender with respect to a specific Advance for a specific item of Lender-Financed Inventory.

"Special Terms" shall mean terms disclosed only in the Term Sheet.

"Stock Rights" means any securities, dividends or other distributions and any other right or property which the Dealer shall receive or shall become entitled to receive for any reason whatsoever with respect to, in substitution for or in exchange for any securities or other ownership interests in a corporation, partnership, joint venture or limited liability company constituting Collateral and any securities, any right to receive securities and any right to receive earnings, in which the Dealer now has or hereafter acquires any right, issued by an issuer of such securities.

"Subsidiaries" means, as to any Person: (a) a corporation of which shares of stock or other ownership interests having ordinary voting power (other

than stock or other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person, and (b) any partnership, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a Fifty Percent (50%) equity interest.

"Term Sheet" shall mean the addendum to this Agreement, as modified from time to time, which indicates specific terms and fees, including without limitation, terms regarding the Credit Limit, Initial Advance, Special Terms, Floorplan Fees, Float Fees, Loan Fees, Extension Fees, Finance Fees Interest, Initial Period, principal reduction, and Curtailment Date Extensions and which, as modified from time to time, is incorporated herein by this reference.

"Title" shall mean the certificate of title or other document evidencing ownership of a Unit issued by a duly authorized state, province or government agency.

"UCC" shall mean the Uniform Commercial Code as enacted in the State where the Collateral is located and the version in effect as of the date of this Agreement.

"Unit" shall mean any manufactured item, including vehicles for which a certificate of title or a MSO exists which is the subject of an Advance by Lender to Dealer under this Agreement.

"Unmatured Default" means any event which with notice, or lapse of time, or both, would constitute a Default.

"Waivers" shall mean, collectively, any and all landlord's waivers, warehouseman's waivers, consignee waivers, creditor's waivers, mortgagee waivers and processing facility and similar bailee's waivers, executed and delivered in connection with this Agreement, in form and substance satisfactory to Lender, together with all amendments, supplements, modifications, substitutions and replacements.

IN WITNESS WHEREOF, the Dealer, on behalf of themselves individually and in their representative capacities, and Lender have caused this Agreement to be executed by their respective officers duly authorized as of ___08/11/2011___ 2011.

"Dealer"

Legal Name of Dealer:   K.W.MINISTRIES, INC.

Assumed Business Name of Dealer (if any):

C.R.U.S.H. AUTO SALES

By: _____

Printed Name:   KENNETH W WILLIAMS

Title:  President

Accepted:      "Lender"

Auction Credit Enterprises, LLC,
a Texas limited liability company

By: _____

Name: Tedd Martin

Title:  Chief Operating Officer

STATE OF __Tex.__      )
                       ) SS:
COUNTY OF __Allen__    )

JOSE M. MADRID
Notary Public, State of Texas
My Commission Expires
August 05, 2014

Before me, a Notary Public in and for said County and State, personally appeared KENNETH W WILLIAMS, known to me to be the President of K.W.MINISTRIES, INC., a corporation, and executed the foregoing for and on behalf of said corporation.

Witness my hand and Notarial Seal, this ___ day of __Aug__ 2011.

Notary Signature: _____

Notary, Printed : _____

My Commission Expires:            My County of Residence:

___8-5-14___                      ___Allen___

# TERM SHEET

DEALER LEGAL NAME:     K.W.MINISTRIES, INC
ASSUMED BUSINESS NAME (IF ANY):     C.R.U.S.H. AUTO SALES

The following, as defined in the Demand Promissory Note and Security Agreement, shall apply effective immediately to any Advance made by Lender to Dealer under the Note and pursuant to this Term Sheet.

I.   The Credit Limit shall be SEVENTY FIVE THOUSAND ($75,000).

II.  FLOORPLAN:

| Period | Number of Days in Period | Required Principal Reduction to Extend Maturity Date |
|--------|--------------------------|------------------------------------------------------|
| 1 | 56 | 20% |
| 2 | 28 | Not applicable |

Floorplan Fee schedule, Contract Rate, and Reserve per Advance

| Unit Loan Amount: | Floorplan Fee: | Contract Rate: | Reserve per Advance |
|-------------------|----------------|----------------|---------------------|
| $0 to $2,499 | $105 | 3.5% | 75 |
| $2,500 to $4,999 | $125 | 3.5% | 75 |
| $5,000 to $9,999 | $145 | 3.5% | 75 |
| $10,000 to $14,999 | $175 | 3.5% | 75 |
| $15,000 to $19,999 | $205 | 3.5% | 75 |
| $20,000 to $24,999 | $245 | 3.5% | 75 |
| $25,000 to $29,999 | $285 | 3.5% | 75 |
| $30,000 to $34,999 | $325 | 3.5% | 75 |
| $35,000 to $40,000 | $365 | 3.5% | 75 |
| Over $40,000 | Approval Required | | |

Notwithstanding anything herein expressed or implied to the contrary herein. (i) any amount of Interest due and owing shall be calculated as provided herein and then rounded up to the next higher even $5.00 increment and such higher amount shall be the amount of Interest due and owing to Dealer hereunder, (ii) Interest shall accrue and shall be calculated and charged for a minimum period minimum of 28 days regardless of when the Advance is repaid; and (iii) in the event that the Advance is repaid after the 28th day from the date that the Advance is made, additional Interest shall accrue and shall be calculated and charged (but shall be due and payable on the date that the Advance is repaid) for a period after the Advance is repaid that ends on the date that is the next higher even seven day increment with such seven day increments being calculated from the date that the Advance is made.

III. FLAT FEE:

| Period | Number of Days in Period | Required Principal Reduction to Extend Maturity Date |
|--------|--------------------------|------------------------------------------------------|
| 1 | 28 | Not applicable |

Float Fee schedule

| Unit Loan Amount: | Flat Fee: | Contract Rate: |
|-------------------|-----------|----------------|
| $0 to $2,499 | $65 | None |
| $2,500 to $4,999 | $85 | None |
| $5,000 to $9,999 | $115 | None |
| $10,000 to $14,999 | $165 | None |
| $15,000 to $19,999 | $195 | None |
| $20,000 to $24,999 | $225 | None |
| $25,000 to $29,999 | $265 | None |
| $30,000 to $34,999 | $295 | None |
| $35,000 to $40,000 | $315 | None |
| Over $40,000 | Approval Required | |

Executed by the undersigned duly authorized representative effective the ___11___ of ___Aug___, 2011.

"Dealer"                                                    Accepted:

Legal Name of Dealer  K.W.MINISTRIES, INC            "Lender"
Assumed Business
Name (if any)  C.R.U.S.H. AUTO SALES                 Auction Credit Enterprises, LLC, a Texas limited liability company

By: _____                                 By: _____
Name: KENNETH W WILLIAMS                              Name: Tedd Martin, Chief Operating Officer